## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| WILLIAM R. PESKIN; MARK PERKINS; KENNETH L. KLAER; and MARIE R. KLAER, on behalf of themselves and all other similarly situated, | ) ) ) ) ) ) | **CASE NO. 1:21-cv-00002-SCJ** |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| PEACHTREE INVESTMENT SOLUTIONS, LLC; DWAYNE PETERSON DAVIS; J. STEPHEN BUSH; OLD IVY CAPITAL PARTNERS, LLC; DANIEL S. CARBONARA; BRYAN CAVE LEIGHTON PAISNER LLP; TENNILLE & ASSOCIATES, INC.; JEAN H. ROBERTS, IN HER CAPACITY AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF DAVID R. ROBERTS; FOOTHILLS LAND CONSERVANCY, INC.; WILLIAM C. CLABOUGH, SR.; and WARREN AVERETT, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| *Defendants*. | | **JURY DEMANDED** |

1

## FIRST AMENDED CLASS ACTION COMPLAINT

William R. Peskin, Mark Perkins, Kenneth L. Klaer, and Marie R. Klaer ("Plaintiffs") file this First Amended Class Action Complaint to assert claims, on behalf of themselves and all others similarly situated, against Defendants Peachtree Investment Solutions, LLC; Dwayne Peterson Davis; J. Stephen Bush; Old Ivy Capital Partners, LLC; Daniel S. Carbonara; Bryan Cave Leighton Paisner LLP; Tennille & Associates, Inc.; Jean H. Roberts, in her capacity as personal representative of the estate of David R. Roberts; Foothills Land Conservancy, Inc.; William C. Clabough, Sr.; and Warren Averett, LLC (collectively, "Defendants") and allege as follows:

## I.
## INTRODUCTION

1.     This case involves a multi-state, multi-party fraudulent scheme to design, promote, sell and implement a flawed and defective tax savings strategy— the Syndicated Conservation Easement Strategy (the "SCE Strategy")[1]—to Plaintiffs and numerous other individuals (the "Class," as defined below in paragraph 234). Defendants used the same SCE Strategy to effect numerous conservation easement transactions that differed only in name, not in substance.  Because this complex,

---

[1] The term "SCE" has been used widely in the popular press, including *Forbes* and the *Washington Post*, as well as tax publications like *Tax Notes* and the recent indictments of two Atlanta CPAs for their involvement in another SCE Strategy scheme.  *See infra* paragraph 6.

widespread scheme occurred over a period of several years, it is described in this Complaint by way of just a few of the many representative examples.

2.     Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes.  When such easements are placed on property in **strict** compliance with § 170(h) of the Internal Revenue Code (the "Code"), donors of such easements may realize a noncash charitable contribution deduction for the value by which the easement impairs the fair market value of the property.  When **properly** implemented, conservation easements can and do confer legitimate tax advantages to the donor.

3.     However, each of the SCE Strategy transactions in this case was **not** properly implemented and was **never intended to be**.  As its name indicates, the SCE Strategy involves the syndication of a conservation easement transaction to multiple investors, which allows those who would be unable to individually participate in an otherwise capital-intensive transaction to do so.  While syndication itself is not problematic *per se*, many unscrupulous professionals like Defendants found ways, such as the SCE Strategy, to exploit for their own gain the tax deductions that could be generated from syndicated conservation easement transactions.

4.     As described further below, Defendants are a group of conservation easement professionals and advisors who deliberately banded together to give only the **appearance** of legitimacy to the SCE Strategy for their own financial gain.  There

were several reasons why the SCE Strategy presented an attractive money-making opportunity for Defendants.  The 2008-2009 recession left a rampant oversupply of devalued real estate, along with a group of underemployed real estate appraisers, at least some of whom were eager and willing to provide favorable valuations in exchange for the right sum.  This unproductive real estate could be purchased at a discount and sold to investors at a premium for the purported purpose of placing a conservation easement which would generate tax deductions that, due to provisions in the Code, could substantially reduce the individual investor's tax liability.[2]  And because the rules and transactions involved were highly technical, they could not be understood by laypersons such as Plaintiffs and the Class who thus also were unlikely to question the advice being offered by reputable professionals who purported to be experts in this area.

5.    Defendants thus sought to capitalize on their respective expertise in conservation easements and related tax matters so that they could lure individuals to participate in what they represented to be *bona fide* conservation easement

---

[2] The deduction for a qualified conservation easement under Code § 170(h) is a noncash charitable contribution deduction, which unlike most itemized deductions, is not subject to the alternative minimum tax ("AMT").  Without the risk of AMT, the tax benefits flowing from a § 170(h) deduction are especially valuable.  For example, a taxpayer with $500,000 of adjusted gross income could use a § 170(h) deduction to reduce his tax to $25,000, thereby enabling the taxpayer to claim an effective tax rate of 5%.  In addition to federal tax benefits, some states like Georgia offered a state tax credit for conservation easements, which would provide participants a dollar-for-dollar reduction of tax.

transactions and thereby generate substantial fees and land interests for themselves. To do so effectively, each of the Defendants knew they needed the coordinated participation of various role players, including a sponsor, appraiser, attorney, land trust, accountant and "Other Participants,"[3] involved in every step of the SCE Strategy. Defendants deliberately sought out and agreed to work with only those whom they knew through preexisting relationships and/or industry reputation to be "willing" partners in this improper endeavor. Often, as here, the same or substantially similar group of professionals and advisors worked together on numerous SCE Strategy transactions.

6.     Defendants are but a handful of the supposed professionals and advisors who have duped unsuspecting clients to participate in the SCE Strategy. Indeed, the emerging truth about the widespread abuse of conservation easements and the tax deductions they generate has spawned government inquiries, enforcement actions and criminal investigations against various professionals and advisors who used the SCE Strategy to perpetrate a massive tax fraud scheme. *See, e.g.*, *United States v. Zak, et al.*, No. 1:18-cv-05774-AT (N.D. Ga.) (suit filed by the U.S. Department of Justice against several promoters and organizers of other SCE Strategy transactions,

---

[3] "Other Participants" include individuals and entities such as managers, appraisers, attorneys, accountants, brokers, referral sources, engineers, and others not named as Defendants herein who assisted in the design, promotion, sale, and implementation of the SCE Strategy.

seeking permanent injunctions halting these transactions and seeking to disgorge defendants of their ill-gotten gains); *United States v. Stein Agee*, No. 1:20-CR-128 (W.D.N.C.) (criminal case filed against an Atlanta CPA who pleaded guilty to knowingly participating in a fraudulent SCE Strategy scheme from 2013 through 2019); *United States v. Corey Agee*, No. 1:20-CR-129 (W.D.N.C.) (same).

7.     While recent public scrutiny has put a spotlight on the SCE Strategy and its inherent defects, for many years Defendants successfully carried out their carefully orchestrated scheme without detection., As described below, each Defendant played their agreed-to role and used the prepackaged collection of misrepresentations and omissions and various bogus or defective documents to promote, sell, and implement the SCE Strategy.  Defendants' fraud was well-hidden and undiscoverable by Plaintiffs who knew nothing of Defendants' conspiracy and the ways in which they were collaborating behind the scenes.  At all relevant times, Defendants represented themselves as independent professionals and advisers who were helping to guide Plaintiffs and the Class through very technical conservation easement transactions that would generate legal tax deductions for them.

8.     Unbeknownst to Plaintiffs and the Class, Defendants had preplanned and predetermined each step of the SCE Strategy to generate large but improper tax deductions, as detailed further below.  From the outset, Defendants identified and purchased real estate, not for an actual investment or conservation purpose, as they

represented to potential SCE Strategy participants, but to syndicate as many conservation easement transactions as possible in order generate outlandish fees and significant land interests for themselves. Defendants then worked together to promote and implement each syndication, including by drafting and preparing the various documents needed to execute a conservation easement that could be claimed as a charitable contribution deduction. These documents included, *inter alia*, an appraisal of the subject property, the Baseline Documentation Report (documenting the subject property's condition and conservation value), the Conservation Easement Deed, and Appraisal Summary (Form 8283). Defendants represented that these documents supported the *bona fides* of the SCE Strategy and also offered a legal opinion prepared by their co-conspiring tax attorney that affirmed the legitimacy of the transaction and tax deduction generated therefrom. Plaintiffs and the Class reasonably believed and relied on Defendants and their representations, especially since they could not understand the highly technical content or the applicable requirements of conservation easements and were unaware of Defendants' conspiracy. Defendants, however, knew that the SCE Strategy documents had not been prepared in accordance with the IRS's unambiguous directives for them. Defendants also knew (or should have known) that every one of these failures, ***standing alone***, prevented the SCE Strategy from generating a legitimate and legal charitable contribution deduction arising from a conservation easement transaction.

9.     Although Defendants were well aware of the IRS's clear warnings to them and other conservation easement professionals and advisors that the SCE Strategy, as structured and implemented, could not generate legitimate tax deductions, they advised their trusting clients the complete opposite.  Defendants chose to continue to market, sell and profit from the SCE Strategy, believing that they could evade or overcome any IRS scrutiny.  And when the IRS began to zero in on the SCE Strategy as an abusive tax scheme, Defendants either minimized or deliberately kept silent about the IRS's unequivocal position that it would disallow the tax benefits promised to Plaintiffs and the Class.  In fact, the IRS now has made clear that it will disallow these SCE Strategy deductions at the partnership level and has indicated its intent to disallow them at the individual level.

10.     Defendants, through the conspiracy and racketeering scheme alleged herein, convinced at least hundreds of individuals to execute the SCE Strategy and to claim the associated tax deductions on their individual tax returns.  To deliver these bogus tax benefits to Plaintiffs and the Class, Defendants employed and organized entities and individuals to execute their preplanned scheme to convince them to participate in the SCE Strategy.  The co-conspiring Defendants used the mail and/or wires to develop, promote, sell and implement the SCE Strategy, which Defendants all knew was fatally flawed.  This association of entities and individuals

to promote and implement the SCE Strategy thereby constitutes a racketeering enterprise.

11.     This racketeering enterprise directly and proximately injured Plaintiffs and the Class by causing them to pay substantial fees and transaction costs, be exposed to interest and penalties from the IRS, and incur additional accounting and legal fees and expenses to deal with the IRS fallout.  These damages are all the result of Plaintiffs and the Class entering into the SCE Strategy and claiming charitable contribution deductions on their federal and state tax returns based on the defective SCE Strategy as well as Defendants' advice, recommendations, and assistance in connection therewith, as further set out herein.

12.     There were only minor, if any, variations in Defendants' wrongful actions and resulting harm to Plaintiffs and the Class.  And while there are several Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under the relevant tax provisions, the defects in the SCE Strategy, and the concerted actions and misrepresentations by Defendants and their co-conspirators about the SCE Strategy, which were common across the Class, predominate. Plaintiffs allege a common and mutual scheme for tax fraud, in which Defendants knew the SCE Strategy, as structured and implemented, would fail if challenged by the IRS despite Defendants' representations and actions to the contrary.

## II.
## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §
1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction
upon this Court, as at least one member of the proposed Class is a citizen of a state
that is different from at least one Defendant's state of citizenship, and the aggregate
amount in controversy exceeds $5,000,000.  In addition, this Court has jurisdiction
over Plaintiffs' claims based on 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, which
provide jurisdiction for violations of the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.; and 29 U.S.C. § 1367, which
provides jurisdiction for supplemental state claims, including common law fraud and
conspiracy claims.

14.     Personal jurisdiction comports with due process under the United States
Constitution, the long-arm statute of Georgia (O.C.G.A. § 9-10-91), and the
provisions of 18 U.S.C. § 1965(b) and (d).

15.     Without limiting the generality of the foregoing, each Defendant
(directly or indirectly) has:

    a.     transacted business in Georgia;

    b.     contracted to supply or obtain services in Georgia;

    c.     availed themselves intentionally of the benefits of doing business
in Georgia;

d.   produced, promoted, sold, marketed, and/or distributed their products or services in Georgia and, thereby, have purposefully profited from their access to markets in Georgia;

e.   caused tortious damage by act or omission in Georgia;

f.   caused tortious damage in Georgia by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

g.   committed acts and omissions that Defendants knew or should have known would cause damage (and, in fact, did cause damage) in Georgia to Plaintiffs and the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

h.   engaged in a conspiracy with others doing business in Georgia that caused tortious damage in Georgia; and/or

i.   otherwise had the requisite minimum contacts with Georgia such that, under the circumstances, it is fair and reasonable to require Defendants to come to Court to defend this action.

16.     In addition to the bases of personal jurisdiction against each of the Defendants set forth herein, Defendants conspired with one another to commit torts that were directed at and harmed Georgia residents.  Consequently, Defendants have purposefully availed themselves of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to jurisdiction of the courts of the State of Georgia.

17.     Venue is proper under 28 U.S.C. § 1391, because, *inter alia*, a substantial part of the events or acts giving rise to the causes of action alleged in this Complaint arose in, among other places, this District, and the harmful effects of Defendants' fraud and wrongful conspiracy were felt in, among other places, this District.  In addition, venue is proper under 18 U.S.C. § 1965 because Plaintiffs reside in this District.

### III.
### PARTIES

18.     Plaintiff William R. Peskin is an individual and a citizen of Dekalb County, Georgia. This Plaintiff resides in Atlanta, Georgia within this District.

19.     Plaintiff Mark Perkins is an individual and a citizen of Dekalb County, Georgia.  This Plaintiff resides in Atlanta, Georgia within this District.

20.     Plaintiff Kenneth L. Klaer is an individual and a citizen of Fulton County, Georgia. This Plaintiff resides in Johns Creek, Georgia within this District.

21.     Plaintiff Marie R. Klaer is an individual and a citizen of Fulton County, Georgia. This Plaintiff resides in Johns Creek, Georgia within this District. Kenneth Klaer and Marie Klaer are collectively referred to herein as the "Klaer Plaintiffs."

22.     Defendant Peachtree Investment Solutions, LLC ("Peachtree") is a limited liability corporation organized and existing under the laws of Georgia with its principal place of business at 34 Old Ivy Road, Suite 200, Atlanta, Georgia 30342. This Defendant has appeared herein.

23.     Defendant Dwayne Peterson Davis ("Davis") is an individual and, upon information and belief, resides at 3197 Chatham Road NW, Atlanta, Georgia. This Defendant is or was during the relevant period a member and/or employee of Peachtree.  This Defendant has appeared herein.

24.     Defendant J. Stephen Bush ("Bush") is an individual and, upon information and belief, resides at 3110 W. Addison Drive, Alpharetta, Georgia.  This Defendant is or was during the relevant period a member and/or employee of Peachtree.  This Defendant has appeared herein.  Defendants Peachtree, Davis and Bush are collectively referred to herein as the "Peachtree Defendants."

25.     Defendant Old Ivy Capital Partners, LLC ("Old Ivy") is a limited liability corporation organized and existing under the laws of Georgia with its principal place of business at 460 E. Paces Ferry Road, Atlanta, Georgia 30305. This Defendant has appeared herein.

26.     Defendant Daniel S. Carbonara ("Carbonara") is an individual and, upon information and belief, resides at 4627 Angelo Drive NE, Atlanta, Georgia. This Defendant is or was during the relevant period a member and/or employee of Old Ivy.  This Defendant has appeared herein.  Defendants Old Ivy and Carbonara are collectively referred to herein as the "Old Ivy Defendants."

27.     Defendant Tennille & Associates, Inc. ("Tennille") is a corporation organized and existing under the laws of North Carolina with its principal place of business at 820 State Farm Road, Suite B, Boone, North Carolina 28607.  This Defendant has appeared herein.

28.     Defendant Jean H. Roberts is an individual and, upon information and belief, resides at 11 Coleman Street, Weaverville, North Carolina. This Defendant is the personal representative of the estate of David R. Roberts, who was during the relevant period an employee of Tennille.  This Defendant has appeared herein. Defendants Tennille and Roberts are collectively referred to herein as the "Tennille Defendants."

29.     Defendant Foothills Land Conservancy, Inc. ("Foothills") is a non-profit corporation organized and existing under the laws of Tennessee with its principal place of business at 3402 Andy Harris Road, Rockford, Tennessee 37853. This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.  At all relevant times, this

Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and upon information and belief, maintains a designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed himself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  This Defendant has appeared herein.

30.     Defendant William S. Clabough, Sr. ("Clabough") is an individual and, upon information and belief, resides at 4416 Cave Mill Road, Maryville, Tennessee. This Defendant is or was during the relevant period an employee of Foothills.  This Defendant has appeared herein.  This Court has personal jurisdiction over this

Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.  At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and upon information and belief, maintains a designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency. This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  This Defendant has appeared herein. Defendants Foothills and Clabough are collectively referred to herein as the "Foothills Defendants."

31.     Defendant Bryan Cave Leighton Paisner LLC ("Bryan Cave") is a limited liability partnership organized and existing under the laws of Missouri with its principal place of business at 211 North Broadway, Suite 3600, St. Louis, Missouri, 63102.  This Defendant has appeared herein.

32.     Defendant Warren Averett, LLC ("Warren Averett") is a limited liability corporation organized and existing under the laws of Alabama, with its principal place of business at 2500 Acton Road, Suite 200, Birmingham, Alabama.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.  At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably

anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

## IV.
## FACTUAL BACKGROUND

33.     Plaintiffs, on their own behalf and on behalf of the Class, seek the recovery of damages that Plaintiffs and the Class sustained in connection with their participation in the SCE Strategy by bringing claims for violations of RICO, 18 U.S.C. §§ 1961-1968, violations of Georgia RICO, O.C.G.A. §§ 16-4-1, *et seq*., fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, professional malpractice, negligence, negligent misrepresentation, rescission, and civil conspiracy.  Plaintiffs and the Class seek compensatory and punitive damages against Defendants for damages arising from the SCE Strategy that Defendants jointly and in concert developed, promoted, sold, and implemented.

**A.     The History and Purpose of Conservation Easements.**

34.     A conservation easement is a legal agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

35.    In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property.  The Code provides for certain exceptions where a deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

36.    A "qualified conservation contribution" is defined as a contribution (1) of a qualified real property interest, (2) to a qualified organization, (3) made exclusively for conservation purposes.  Before a deduction can be claimed, however, specific criteria must be met.  As set out herein, the SCE Strategy failed to comply with the requirements that Defendants all knew were necessary to create a qualified conservation contribution.

## B.    The IRS Warns Defendants Regarding Potential Abuses of Syndicated Conservation Easements.

37.    As early as 1984, the IRS warned professional advisors, promoters, sponsors, and other professionals dealing with conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated.  *See* IRS News Release, IR-81-122.  The Senate Finance Committee was aware of and concerned about tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property.  Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of

excessive deductions.  And because of the subjective nature of valuation, tax shelter promoters could promote and sell transactions that claim excessive charitable deductions and rely on the "audit lottery" to attempt to conceal the inflated charitable contribution deduction from the IRS.  Because of these concerns, the Senate Finance Committee made it clear to professional advisors that stronger substantiation and overvaluation provisions should be applicable to charitable contributions of property.

38.    Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("DEFRA").  DEFRA set forth specific provisions for the substantiation of charitable contributions, including instructing the Secretary to prescribe regulations under Code § 170(a)(1) to require any individual, closely-held corporation or personal service corporation claiming a deduction under § 170 for charitable contributions to obtain a qualified appraisal for the property contributed and to attach an Appraisal Summary (Form 8283) to the tax return on which the deduction is first claimed for such contribution.  A qualified appraisal was to specifically disclose the cost basis, acquisition date of the subject property, and such additional information as the Secretary may prescribe in such regulations.

39.    The Secretary complied with Congress's mandate by promulgating regulations pursuant to § 155(a) of DEFRA.  The relevant regulation reiterates that

no deduction under § 170 of the Code shall be allowed with respect to a charitable contribution unless the substantiation requirements are met. These Treasury Regulations require a fully completed Appraisal Summary (Form 8283) to be attached to the return and provides a list of what the Appraisal Summary must include, including specifically the identification of the cost basis of the property as well as the date and manner by which the donor acquired the property. A supplemental statement may be attached to the Appraisal Summary providing an explanation of reasonable cause in the event any or all of the required information has not been provided.

40.    These regulations made it clear to professional advisors, promoters, sponsors and other professionals dealing with conservation easements that their failure to comply with the substantiation requirements would result in the disallowance of the claimed deduction and expressly requires that a charitable deduction may be allowed only if the contribution is verified in the manner specified by the Treasury Regulations.

41.    In 2004, the IRS officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including *inter alia*, failure to substantiate the fair market value of the tax benefit and other valuation issues. *See* IRS Notice 2004-41 (July 12, 2004). At that time, the IRS advised

professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claimed disallowed deductions from conservation easements.

42.     In 2006, the IRS officially put professional advisors and promoters of conservation easements on notice of what constitutes a "Qualified Appraisal" and a "Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP") as developed by the Appraisal Standards Board of the Appraisal Foundation.

43.     In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and taxpayers who claimed disallowed deductions would pay a heavy price.  Specifically, on December 23, 2016, the IRS issued Notice 2017-10, which designated certain syndicated conservation easements, like the SCE Strategy, as "listed transactions," meaning that promoters and participants must affirmatively tell the IRS of their participation in such transactions.  The Notice specifically identified transactions where members in pass-through entities receive promotional material offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution.

44.    In 2019, the IRS added syndicated conservation easement transactions, like the SCE Strategy, to its "Dirty Dozen" list of tax scams to avoid.  *See* https://www.irs.gov/newsroom/abusive-tax-shelters-trusts-conservation-easements-make-irs-2019-dirty-dozen-list-of-tax-scams-to-avoid.

45.    Most recently, on June 25, 2020, the IRS stated in IR-2020-130 that it "will continue to disallow the claimed tax benefits, asserting civil penalties to the fullest extent, considering criminal sanctions in appropriate cases, and continuing to pursue litigation of the cases that are not otherwise resolved administratively."

**C.    Defendants Jointly Develop, Promote, and Implement the SCE Strategy.**

46.    In the face of IRS warnings and escalating government scrutiny, Defendants were undeterred in their commitment to develop, promote, sell and implement the SCE Strategy.  Defendants believed, erroneously, that they could use their collective expertise to structure and implement the SCE Strategy in a way that would evade or at least overcome IRS scrutiny.  To that end, Defendants agreed to a particular structure for the SCE Strategy and to each carry out their assigned roles in implementing the SCE Strategy.

**1.    The Structure of the SCE Strategy.**

47.    As per Defendants' design, the SCE Strategy involves the syndication of a conservation easement transaction through the use of an entity taxed as a partnership under subchapter K of the Code.  Each SCE Strategy thus involves a

limited liability company ("LLC") formed under state law to serve as the "Syndicate," or the entity that holds the subject property on which a conservation easement will be placed.  In most or all cases, the individuals participate in the Syndicate through a "Fund," another LLC formed for the purpose of acquiring an interest in the Syndicate and thereby allowing for several individuals to participate in a single conservation easement transaction.

48.    Since LLCs are taxed as a partnership, *i.e.*, a pass-through entity, for federal tax purposes, the LLCs themselves are not liable for income tax, but their members in their separate or individual capacities based on the income, losses, deductions, and credits that flow through to them from the LLC.  Under the Code, a charitable contribution is one item that flows through to the individual partners.  The creation and use of a Syndicate thus greatly expanded the "market" for the SCE Strategy because it allowed for the participation of individuals who would be unable to participate in conservation easement transactions which require significant capital.[4]

---

[4] Though uniformly employed in the SCE Strategy, the use of an LLC is not essential to a conservation easement transaction, which can be structured differently, such as by using "fractional undivided interests" in the eased real estate. *See Clamping Down on Conservation Easement Shelters*, TAX NOTES (Sept. 8, 2020) ("A partnership is a handy vehicle to whack up ownership of a parcel of land into smaller salable pieces. But there's nothing in a conservation easement shelter that requires a partnership. . . . Investors could just as easily accomplish the goal using an agent, or as tenants in common in the parcel.").

49.     Although a pass-thru entity like an LLC is not liable for and does not pay federal income tax, it still has filing and reporting requirements.  Specifically, an LLC is required to file an annual tax return on Form 1065 that reports the entity's income, deductions, gains, losses, etc.  The LLC is also required to furnish statements, called Schedule K-1s ("K-1s"), to its members (with copies sent to the IRS) that report, *inter alia*, each member's distributive share of partnership income or loss and separately stated items.  The members are then required to report on their individual tax returns their share of the partnership income, loss and/or separately stated items, as they are contained on the K-1s provided to them by the LLC.

50.     In the case of the SCE Strategy, Plaintiffs and the Class, *i.e.*, the Syndicate members, reported the charitable contribution deductions from the SCE Strategy based on the K-1s received from the respective Syndicate in which they were a member, as they are required by law to do.

**2.      The Steps of the SCE Strategy.**

51.     Each and all of the Defendants planned and agreed to the steps of the SCE Strategy in advance and these steps were uniform across Plaintiffs and the Class in virtually every material way:

a.   One or more of the Defendants (usually, whoever agrees to play the SCE Strategy "Sponsor" or "Land Trust," as further described below) identify

and agree to purchase property or properties from a third-party landowner in order to create a conservation easement.

b. Depending on the size of the property or properties, these Defendants agree to subdivide or combine the properties to create multiple parcels of several hundreds of acres each so that each parcel can be used in its own SCE Strategy transaction and multiple SCE Strategy transactions can be promoted from a single piece of property. Subdividing tracts makes it easier for Defendants to sell a particular syndication in a year's time and also maximize fees for themselves. It also allows for further concealment of the gross overvaluations of the property used in support of the SCE Strategy.

c. Once the property is identified and agreement obtained from the landowner, the Sponsor purports to conduct a "due diligence" period, the true purpose of which is to put together promotional materials that include the information and documents necessary to market and sell the SCE Strategy. Among the tasks include:

(i) The Sponsor engages the hand-picked appraiser ("Appraiser") to perform an appraisal of the property to provide a valuation of the proposed conservation easement based on the highest and best use ("HBU") of the land ("Initial Appraisal"). However, the Sponsor predetermines and directs the Appraiser to provide a valuation

that will equal an amount that will generate tax savings in excess of the amounts invested by the Syndicate members. The Appraiser uses his expertise to manipulate applicable rules and concepts for land appraisals to reach the "necessary" valuation. The Appraiser is fully aware that the Initial Appraisal will be used to promote the SCE Strategy to potential participants by purporting to provide an independent, professional analysis of the subject property's HBU and value.

(ii)     The Sponsor engages a consultant (*e.g.*, a land development and/or conservation consultant) to purportedly assess the property for possible development and/or conservation. The development plan is nothing more than a ruse, intended to substantiate the HBU conveyed to Syndicate members in the Initial Appraisal and for Defendants to deceive the IRS as to a purportedly legitimate land-use option.

(iii)     The conservation easement donee (the "Land Trust") agrees to accept the eventual donation from the Syndicate and prepares a preliminary Baseline Documentation Report to establish the condition of the property, identify the conservation values and substantiate the purported conservation purpose. The Land Trust also drafts a

Conservation Easement Deed pursuant to which the property will be donated to it.  The Land Trust is fully aware that these materials will be sent and used by potential SCE Strategy participants to lend the appearance of legitimacy to the conservation easement donation.

(v)     The hand-picked tax attorney ("Attorney") prepares a draft tax opinion letter affirming the legality of the SCE Strategy and the promised tax benefits ("Legal Opinion").  The Attorney also prepares and assists with the preparation of the necessary corporate, real estate, and other transactional documents needed to implement the SCE Strategy.  The Attorney knows and intends for the Legal Opinion and certain of the transactional documents to be used to promote the SCE Strategy to potential participants.

d.   The Sponsor, either directly or through another "Promoter" who agrees to refer SCE Strategy participants to the Sponsor, promotes the SCE Strategy and sends the jointly prepared promotional materials, which include or explicitly incorporate, *inter alia*, the Initial Appraisal, Baseline Documentation Report, Conservation Easement Deed, and Legal Opinion. The promotional materials describe the SCE Strategy as an opportunity for participants to purchase an interest in the Syndicate, which holds property that will be developed for investment profit or conserved for tax benefits.

Defendants specifically tout the tax benefits of a conservation easement donation, promising Syndicate members a legal return in excess of the amount they pay into the Syndicates.  The Sponsor offers up to approximately 98-99% of the interests in the Syndicate to potential participants in exchange for cash.

    e.   Once there are sufficient capital commitments from interested SCE Strategy participants, the Sponsor obtains for the Syndicate the subject property from the landowner in a series of steps.  For each piece of property on which a conservation easement is to be placed, the Sponsor effects an initial transfer of the property from the landowner to an LLC that the Sponsor forms to hold the property prior to syndication ("PropCo").  The Sponsor then directs the landowner, through PropCo, to convey his entire interest in the property to the Syndicate in exchange for a nearly 100% interest in the Syndicate.  The Syndicate thereby owns a 100% interest in the property and is initially 99.99% owned by PropCo and 0.01% by an entity formed and owned by the Sponsor to help manage the Syndicate and also serve as the Manager and Tax Matters Partners of the Fund.

    f.   Interested participants purchase the membership interests offered in the Syndicate (through the Fund).  The end result is that the Syndicate is owned 98-99% by the participants and the remainder by the initial Syndicate members (usually 1% by PropCo and .01% by another entity formed, owned

and controlled by the Sponsor that also will serve as the Manager and Tax Matters Partners of the Fund).

g.   The Sponsor prepares a purported development plan for the property and presents it to the Syndicate members as a legitimate investment opportunity.  The Syndicate members are asked to vote on whether to pursue the development plan or conservation plan.    Based on material misrepresentations and omissions by Defendants, the fact that only the conservation plan offers an immediate, fixed return that requires no additional capital outlay, and the Initial Appraisal's bogus valuation of the proposed conservation easement donation, the Syndicate members vote in favor of the conservation plan.  The Sponsor, as Manager of the Fund, formally casts the vote on behalf of the Fund as a member of the Syndicate.  The Sponsor, also as Managing Member of the Syndicate, casts a vote in favor of the conservation plan.

h.   The following Defendants finalize the necessary implementation documents for the SCE Strategy, all purportedly on behalf of the Syndicate:

(i)     The Appraiser prepares an allegedly qualified appraisal ("Appraisal"), which supports the decision in favor of the conservation plan and determines the value of the conservation easement.  Once again, the Appraiser provides a value that is predetermined and directed

by the Sponsor. The Appraiser knowingly misrepresents that the qualified appraiser meets the requirements in the Code and IRS regulations when he does not.

(ii)    The Land Trust prepares a final Baseline Documentation Report and finalizes the Conservation Easement Deed, also in conjunction with the Sponsor.  The Land Trust purports to identify and memorialize the agreement to protect the conservation values of the subject property and conservation purpose of the donations.  In truth, the Land Trust's interest is to ensure that the donation is effected, so that it can obtain land interests, fees, and other charitable contributions for participating in the SCE Strategy scheme.

(iv)    If the Sponsor so requests, the Attorney finalizes and issues a final Legal Opinion to the Syndicate and its members.

i.    The Syndicate, at the Sponsor's direction, donates to the Land Trust a conservation easement on the subject property, and the Conservation Easement Deed is executed by the grantor and grantee and recorded with the relevant State.

j.    The Land Trust issues to the Syndicate a contemporaneous written acknowledgement of the conservation easement donation and represents that no goods or services were provided in exchange.

k. The hand-picked accountant ("Accountant") prepares the Syndicate's tax return, reporting the donation of the conservation easement as a charitable contribution deduction and representing its value (the purported decrease in the property's appraised value resulting from the restriction placed on the property by the conservation easement) according to the Appraisal. The Accountant allocates this deduction to each Syndicate member based on his respective ownership interests in the Syndicate and directs each Syndicate member to report their allocated deduction on their individual tax return. Although the Accountant knows that the information provided to it by the Sponsor or other promoter of the SCE Strategy contain numerous misrepresentation and omissions needed to accomplish Defendants' scheme, the Accountant agrees to "copy and paste" the relevant numbers from the implementation documents without asking questions or raising concerns.

52. Defendants deliberately designed and structured the SCE Strategy in this way so that that individuals like Plaintiffs and the Class who lack expertise in conservation easements and tax matters would be unable to detect their fraudulent scheme. To Plaintiffs and the Class, each and all of the SCE Strategy steps, which Defendants purported to substantiate with technical transaction documents, were carried out to effect a conservation easement in full compliance with Code § 170(h) and to generate legal tax deductions for them. However, as Defendants knew, the

SCE Strategy was a complete sham.  Defendants were doing nothing more than packaging and selling grossly overvalued and ineffectively structured federal tax deductions that the IRS already was carefully scrutinizing and indicating to conservation easement professionals it would disallow.

### 3.    The SCE Strategy Players and Roles

53.    Defendants planned and agreed to the specific roles and responsibilities that each of them would play in the SCE Strategy.  While Defendants would at all times represent themselves to Plaintiffs and the Class as independent professionals and advisors, they agreed to keep secret their preexisting relationships, conflicts of interest, and their collective involvement in designing, promoting and implementing the SCE Strategy.

54.    <u>The Sponsor and/or Promoter: The Peachtree Defendants</u>.    The Peachtree Defendants are the key developers and organizers of the SCE Strategy, and they agreed to act as the Sponsor and at times also the Promoter for each of the transactions they were involved in.

55.    Davis is a real estate professional with an extensive background and experience in the tax credit equity syndication business, including as Managing Director of Credit Suisse for many years.  Davis founded Peachtree in October 2008 as a private investment firm specializing in tax-advantaged investments such as conservation easements and providing consulting services regarding tax liability

management.  Davis is Managing Principal and Bush, his long-time business partner, is Principal.  Bush earned his MBA from the University of Chicago and is also an experienced business finance professional.  Davis and Bush together own 100% of Peachtree (or owned 100% during the relevant time period), and they manage and control all aspects of the company.

56.     By 2009, the Peachtree Defendants decided to form other entities such as Peachtree Clean Energy Ventures, LLC ("PCEV") and Land Conservation Ventures, LLC ("LCV"), to support and grow its conservation easement business, including the development, promotion, and implementation of the SCE Strategy. Davis caused PCEV to be formed in June 2009, and Bryan Cave formed LCV on behalf of the Peachtree Defendants in October 2009 for this very purpose.  Both are wholly-owned by Peachtree and controlled and managed entirely by Davis and Bush who also serve as Principals of PCEV and LCV.  In each SCE Strategy that the Peachtree Defendants agreed to be the Sponsor, the Peachtree Defendants, either directly or through Bryan Cave, used or formed an entity under PCEV or LCV (or another Peachtree-owned entity) to serve in various capacities, including as Manager and Tax Matters Partner of the Fund and Managing Member of the Syndicate so that they could control the operation and management of every aspect of the SCE Strategy and also earn fees in connection with each of their self-appointed roles.

57.     As Sponsor and/or Promoter, the Peachtree Defendants were intimately involved in every aspect of the SCE Strategy, including for each Syndicate: helping to identify and secure the subject properties; forming the corporate entities; drafting, reviewing, approving and/or distributing the promotional materials; preparing and distributing the purported development plan; preparing updates and other information to send to Syndicate members about the SCE Strategy; communicating with and answering questions from Syndicate members about the SCE Strategy; managing the day-to-day tasks of the Syndicate; providing the information needed to prepare the relevant tax returns for the Syndicate and Syndicate members; and participating in and helping to direct the positions to take in the IRS audit and Tax Court proceedings.

58.     Davis and Bush made all of the investment decisions for Peachtree, including with respect to all aspects of the SCE Strategy transactions they designed, promoted and implemented.  Among other things, Davis and Bush were personally involved in selecting and acquiring the SCE Strategy properties and also determining the price at which the landowner would sell his interest in the subject property to the Syndicate.  They appointed themselves (usually Davis) as Manager and Tax Matters Partner of the various SCE Strategy entities, including the Fund, so that they would retain control over all of the decision-making and implementation items for each of the transactions.

59.   The Peachtree Defendants also helped assemble the cast of professionals that would purport to advise and guide Plaintiffs and the Class through the SCE Strategy.  As described below, the Peachtree Defendants had preexisting relationships with all or nearly all of the other Defendants and/or knew them by industry reputation as SCE Strategy proponents.

60.   The Promoter: The Old Ivy Defendants.  In or about 2010, Carbonara formed Old Ivy to be a principal investor in middle market operating companies, project finance, and real estate opportunities, including conservation easements. The Old Ivy Defendants developed relationships with other well-known SCE Strategy promoters such as Aprio, LLP ("Aprio") and made their way onto the conservation easement referral list that Aprio sent to its clients.[5]  In 2013, the Old Ivy Defendants also shared an office with the Peachtree Defendants.

61.   Upon information and belief, the Old Ivy Defendants agreed to act as the Promoter of any SCE Strategy for which the Old Ivy Defendants referred a sufficient number of participants.  As Promoter, the Old Ivy Defendants helped identify potential participants of the SCE Strategy; distributed the promotional

---

[5] Aprio (formerly known as Habif, Arogeti & Wynne, LLP) and Robert Greenberger, an Aprio partner, are named defendants in another civil case pending in this Court for their roles in promoting other fraudulent SCE Strategy transactions.  *See Andrew Lechter, et al., v. Aprio, LLP f/k/a Habif, Arogeti & Wynne, LLP, et al.* No. 1:20-CV-01325-AT (N.D. Ga.).  Greenberger also is or was under IRS investigation for his involvement in several SCE Strategy transactions.

materials; and acted as the primary point of contact for Syndicate members by facilitating communications, providing updates and other information, and answering questions about the SCE Strategy, all in coordination with the Peachtree Defendants to ensure a consistent message was being conveyed.

62.   <u>The Appraiser: The Tennille Defendants</u>.  Tennille is an accounting firm and Roberts was an appraiser at the firm.  The Tennille Defendants, and in particular Roberts, was well known among industry insiders for being willing to provide "favorable" valuations of conservation easements to be used in syndicated transactions such as the SCE Strategy.[6]  In fact, Roberts previously had been suspended for his role in preparing various sham appraisals.

63.   In addition to their notoriety among industry insiders, Davis and Bush knew that the Tennille Defendants would provide the inflated valuations needed to successfully market the SCE Strategy, because Davis and Bush sought out Roberts after reviewing sample conservation easement appraisals that he had prepared and interviewed Roberts to discuss his valuations.  Given the "easy" fees to be made, the Tennille Defendants agreed to be the Appraiser for the SCE Strategy.

---

[6] Several conservation easement professionals who have come under IRS scrutiny have informed the IRS that they agreed that the Tennille Defendants' appraisals prepared in connection with various SCE Strategy transactions are a sham and they would not rely on these appraisals in future discussions or negotiations with the IRS.

64.     As Appraiser, the Tennille Defendants performed the Initial Appraisal to help promote the SCE Strategy and then the final Appraisal to support the valuation of the conservation easement and the charitable deduction taken by each Syndicate (which, in turn, flowed through to each Syndicate member).  As the Tennille Defendants knew, their job in the SCE Strategy was to manipulate the "art" of appraising to reach predetermined valuations needed to claim large tax deductions, and not to actually engage in any objective analysis.  In fact, as set out herein, the Tennille Defendants had no regard for, and often ignored, the accepted principles of appraising.  For instance, in one of the SCE Strategy transactions that the Peachtree Defendants worked alongside with the Tennille Defendants for tax year 2013, Bush advised Roberts that the previously stated total acreage and home site exclusions in the Initial Appraisal were inaccurate and thus updated valuation numbers were needed for the final Appraisal.  However, Roberts chose to update only the total and exclusion acreage in the final Appraisal and made no changes whatsoever to the before value or easement value.  The Peachtree Defendants still used the final Appraisal in support of this SCE Strategy transaction.[7]

---

[7] Unsurprisingly, the IRS examined this transaction (known as "Rock Creek") and the matter proceeded to Tax Court, with the Syndicate again represented by Bryan Cave.  On February 7, 2020, the Tax Court granted the IRS's motion for partial summary judgment and disallowed the charitable contribution deduction of $7,875,000 in its entirety.

65.    The Tennille Defendants also prepared and signed the Appraisal Summary (Form 8283) under penalties of perjury, declaring the legitimacy of the claimed charitable contribution deduction, all the while providing incomplete or inaccurate information about the subject properties in order to evade IRS scrutiny. The Tennille Defendants intentionally reported the wrong date of acquisition, manner of acquisition, and cost basis of the subject properties, or simply left blank these required fields on the Form 8283 and offered no explanation in the accompanying Supplemental Statement.  They flouted the Code and regulation requirements because disclosing the correct information—that the subject property had been contributed to, not purchased by the Syndicate, just shortly before the donation of the conservation easement and for a price that was about one-fourth of the purported easement value—would raise "red flags" to the IRS, including that the properties were overvalued.

66.    <u>The Land Trust: The Foothills Defendants</u>.  Foothills is a "qualified" land trust within the meaning of Code § 170(h)(3) and has extensive experience with conservation easements, currently overseeing more than 300 easements over 47,000 acres that have been donated to it.  These easements are located throughout the southeast region of the United States, including Alabama, Georgia, Kentucky, North Carolina, South Carolina, Virginia, and Tennessee.  For each of the easements they considered, the Foothills Defendants arranged for and conducted initial property site

visits, and once the donation was accepted, undertook to visit and regularly monitor the properties.

67.    Clabough is the Executive Director of Foothills, and as such, takes an active and primary role in every aspect of a conservation easement that is considered for donation or actually donated to Foothills.  As Clabough himself has said, every conservation easement donation to Foothills starts with him and he is involved in all aspects of the Foothills operation, including liaising with landowners, conducting site visits to the subject properties, working on and reviewing the Baseline Documentation Report and Conservation Easement Deed, and handling related court matters.

68.    As the Land Trust for the SCE Strategy, Foothills was not merely a passive recipient of the conservation easement donation by the Syndicate.  Foothills, and in particular Clabough, were instrumental to the SCE Strategy because they helped identify potential real estate on which conservation easements could be placed and connected landowners with Sponsors and Promoters like the Peachtree Defendants and Old Ivy Defendants.   Once Foothills learned of a potential conservation easement donation, Clabough reached out to the landowner to arrange and conduct a site visit, assess the landowner's objectives, and evaluate the property's alleged conservancy values as well as alleged development potential. Clabough also would direct the Foothills biologists to visit the property to research

its biological and botanical aspects. Based on these initial conversations and visits, Clabough determined whether to make a recommendation to the Foothills Board of Directors for pre-approval. Clabough himself conducted many of the initial site visits as well as the monitoring visits once the property was donated to Foothills.

69. The Foothills Defendants also prepared preliminary studies and inspections to draft the preliminary Baseline Documentation Report as well as prepared the draft Conservation Easement Deed, both of which they knew would be and intended to be used in the SCE Strategy promotional materials. The Foothills Defendants retained and paid one of its own Board of Directors members to draft the Conservation Easement Deed needed for each SCE Strategy transaction in which they participated. Once the Syndicate voted to pursue the conservation plan, the Foothills Defendants and its "outside counsel" then prepared final versions of these same documents which they knew would be filed with the Syndicate's tax return, along with the Appraisal Summary (Form 8283), which they also signed as the donee to substantiate the charitable contribution deduction in accordance with Code § 170(h). Contemporaneous with the donation, the Foothills Defendants provided a letter to each Syndicate confirming the donation and representing that no goods or services were provided in exchange for the donation.

70. By participating in the SCE Strategy, Foothills gained significant land interests and earned fees to purportedly cover the future costs of monitoring and

enforcement of the conservation values. In certain instances, including in the TOT Syndicate transaction, the Foothills Defendants also managed to extract from the Syndicate, wholly controlled by the Sponsor, additional cash contributions to Foothills.

71. In 2013, Foothills accepted 14 donations of conservations easements spanning more than 11,270 acres. These numbers reflected a "best ever" record in a single year for Foothills.

72. <u>The Attorney: Bryan Cave</u>. Bryan Cave is an international law firm with a reputable real estate tax practice. Bryan Cave has been outside counsel to Peachtree since at least 2009, advising and providing services in connection with Peachtree's conservation easement business and specifically the SCE Strategy. Bryan Cave thus was intimately familiar with all aspects of the SCE Strategy, including that the transactions had been designed to generate large tax deductions for Syndicate members and that the legality of claiming these deductions would be supported by, among other things, the Legal Opinion.

73. Bryan Cave agreed to act as the Attorney for the Syndicate and Syndicate members (as well as for the Sponsor) in connection with the SCE Strategy. Bryan Cave helped form the necessary entities, drafted the private placement memoranda, operating agreements, subscription agreements and other legal documents used in the promotional materials to promote and sell each SCE Strategy.

42

Bryan Cave knew that the promotional materials were intended to lure potential SCE Strategy participants and to persuade them of the *bona fides* of the contemplated conservation easement donation.

74.     Bryan Cave also drafted the Legal Opinion to affirm the legality of the SCE Strategy and the tax deduction generated therefrom.  Bryan Cave knew and intended for its Legal Opinion to be used in the promotional materials to promote and sell the SCE Strategy.  In preparing the draft as well as in issuing the final version of the Legal Opinion, Bryan Cave reviewed and incorporated, among other things, the Appraisal prepared by the Tennille Defendants and the Baseline Documentation Report and Conservation Easement Deed prepared by the Foothills Defendants.

75.     In the event the IRS were to audit any Syndicate for executing the SCE Strategy, Bryan Cave agreed to defend the merits of the SCE Strategy before the IRS, and if necessary, in Tax Court.

76.     <u>The Accountant: Warren Averett</u>.  Warren Averett is an accounting firm that has served as Peachtree's accountants since Peachtree's inception in October 2008.  Warren Averett's primary contacts at Peachtree were Davis and Bush.  At all

relevant times, Warren Averett knew that the Peachtree Defendants were SCE Strategy promoters and receiving fees for conducting this business.[8]

77.     Warren Averett agreed to play the Accountant in the SCE Strategy and knew the stringent requirements to properly claim a charitable contribution deduction for conservation easements.  In connection with its Peachtree engagement, Warren Averett researched the Code and Treasury Regulations to determine what constituted a "qualified" conservation contribution, the Form 8283 requirements, and the documentation needed in support.  Those at Warren Averett assigned to the Peachtree account also reached out to their colleagues with relevant experience to obtain additional guidance.

78.     As the Accountant, Warren Averett prepared the partnership returns for each Syndicate and Fund used in the SCE Strategy, as well as the K-1s that were sent to Plaintiffs and Class members which set forth each such individual's proportionate share of the Syndicate's charitable contribution deduction to be reported on their individual tax returns.  In doing so, Warren Averett agreed to simply copy the relevant numbers and information in the supporting SCE Strategy documents provided by the Peachtree Defendants, including the Appraisal, Baseline Documentation Report, Conservation Easement Deed, Form 8283, Form 8283

---

[8] George W. Hillegass, a former partner of Warren Averett, was the relationship manager for the Peachtree account and signed Peachtree's and its affiliates' tax returns during the relevant period.  Hillegass is deceased.

Supplemental Statement, and the charitable donation acknowledgement letter. Warren Averett did not make any effort to verify the information provided to it, despite knowing that the SCE Strategy promoters had prepared and furnished the information needed to support the charitable contribution deduction that would be claimed on the Syndicate's and Syndicate members' tax returns.

79.     In 2013 alone, Warren Averett prepared and filed tax returns for various entities that the Peachtree Defendants had formed and used in at least six different SCE Strategy transactions.

**D.    Defendants Jointly Structure and Prepare to Promote, Sell and Implement the SCE Strategy.**

**1.     The Foothills Defendants Identify and Arrange for the Purchase of Real Estate for the SCE Strategy.**

80.     In June 2005 and February 2008, George R. Dixson purchased several large land tracts in Tennessee (about 2,600 acres for approximately $1.9 million). Dixson held these acquired properties and other properties he already owned in several of his wholly-owned LLCs, including Evergreen Pines Planation, LLC ("Evergreen") and Harper Branch Forest, LLC ("Harper Branch").

81.     At some point after the February 2008 acquisitions, Dixson was introduced to Clabough of Foothills who was known for his experience in conservation easements. Dixson and Clabough discussed the properties that Dixson owned and the possibility of placing conservation easements on certain of them.

That initial discussion eventually led to at least eight conservation easements that were placed on portions of Dixson's properties which were then donated to Foothills. The Peachtree Defendants participated in at least seven of these eight easements. The Foothills Defendants and Peachtree Defendants also worked together on several other conservation easement transactions that did not involve Dixson's properties.

82.     At least two of the conservation easements placed on Dixson's properties involved a large tract of real estate spanning across Van Buren County and/or Warren County in Tennessee.   The Peachtree Defendants and Foothills Defendants decided to allot approximately 840 acres of Dixson's property for the SCE Strategy to be called the "High Point" transaction (the "HP Parcel"), and the adjacent 652.16 acres for the "TOT" transaction (the "TOT Parcel").[9]   Harper Branch held the entire HP Parcel, and Harper Branch and Evergreen together held the TOT Parcel (480.76 acres by the former and 171.40 acres by the latter).

83.     Once the Peachtree and Foothills Defendants obtained agreement from Dixson to use the HP Parcel and TOT Parcel for the SCE Strategy, they, the Old Ivy Defendants, the Tennille Defendants and Bryan Cave began to work on the necessary steps to promote and sell each of these transactions.

_____

[9] "TOT" is an abbreviation for the Trail of Tears, a national historic landmark that runs through portions of Dixson's properties.

2.      **The High Point Syndicate Transaction.**

a.      **Plaintiffs Peskin and Perkins Participate in the High Point Syndicate Transaction**

84.    During the first quarter of 2013, the Peachtree Defendants formed the entities that Defendants would use to promote, sell and implement the High Point Syndicate transaction:

a.   Bush formed High Point Holdings, LLC ("HP Holdings") as the Syndicate (on February 11, 2013).

b.   Bush formed LCV Fund XVI, LLC ("LCV Fund XVI"), as the Fund through which the High Point transaction participants would participate in the SCE Strategy (on January 14, 2013).

c.   Bush formed High Point Land Manager, LLC ("HP Land Manager") to serve as Manager and Tax Matters Partner of LCV Fund XVI and as Managing Member of HP Holdings (on March 1, 2013).  HP Land Manager is wholly owned by LCV (which is wholly owned by Peachtree).

d.   Bush formed High Point Property Manager, LLC ("HP Property Manager") as the PropCo (also on March 1, 2013).

85.    On March 14, 2013, Foothills held a meeting for its Board of Directors during which it sought pre-approval to accept the donation of a conservation easement on the HP Parcel.  The Land Director of Foothills explained to the Board that Foothills already held an easement from 2012 on an adjoining tract and that

according to Clabough, the "project" could transpire within the next several weeks. The Board gave unanimous approval.

86.    Beginning in or about April 2013, the Peachtree Defendants directed the Old Ivy Defendants to promote the High Point Syndicate transaction to potential participants, including specifically those individuals who had been referred to the Old Ivy Defendants.  Accordingly, Carbonara began to send out the promotional materials which had been jointly prepared by the Peachtree Defendants, Tennille Defendants, Foothills Defendants and Bryan Cave.  Each of these Defendants collaborated with one another to prepare the promotional materials, with full knowledge and intent that the Promotion Materials would be used to promote and sell the SCE Strategy.  The promotional materials included (i) a two-page summary of the High Point Syndicate transaction prepared by the Peachtree Defendants ("Summary"), and (ii) the LCV Fund XVI Private Placement Memorandum ("PPM") and several exhibits thereto, all prepared by Bryan Cave.

87.    Along with the promotional materials, the Old Ivy Defendants provided to potential participants a list of "[s]elected transaction highlights" which identified the salient features of the High Point Syndicate transaction.  Specifically, Carbonara represented that:

a. LCV Fund XVI was formed to acquire, own, and hold for investment a 98.99% interest in HP Holdings;

b. The current landowners of the HP Parcel will contribute 840 acres which "will be available for development or the granting of a conservation easement valued at $8.85 million";

c. "If conservation is elected, investor receives federal noncash charitable contribution deduction equal to approximately 4.0 times the amount invested (50% deduction reduces taxable income)";

d. "Valuation is supported by two independent certified easement appraisers" and "recent land sales provide[d] further support";

e. The High Point Syndicate transaction was supported by a "[s]hould level tax opinion issued by Bryan Cave";

f. "19.25% of gross proceeds reserved to cover operating expenses, contingences, and audit reserve"; and

g. The High Point Syndicate would be managed by an "[e]xperienced fund manager," including Davis of Peachtree "who previously led the tax credit syndication business at Credit Suisse and has executed over $4 billion of tax advantaged investments."

88. The two-page summary of the High Point Syndicate transaction that the Peachtree Defendants prepared included these same transaction highlights. On the first page of the summary, the Peachtree Defendants also identified the federal and state tax benefits of the SCE Strategy, including that Code § 170(h) permits a

taxpayer to take a charitable deduction for qualified donations of conservation easements; the deduction can be utilized to offset up to 50% of an individual's annual adjusted gross income; and unused portions of these deductions can be carried forward an additional 15 years. The Peachtree Defendants specified that "[d]eductions generated by ownership entities such as partnerships, LLC's, and S-corporations allow for a pass-through of benefits to the underlying owners of the entity."

89.   The second page of the Peachtree Defendants' summary included a chart entitled "Example of Economic Benefit if Conservation is Elected."  The chart listed several hypothetical investment amounts (*e.g.*, $50,000, $100,000, $200,000, etc.) and for each such amount identified the investor's anticipated membership percentage, pro-rata share of deductions, cash value and the return on investment percentage (the latter two figures assuming a 40% effective tax rate).

90.   The PPM described in further detail the High Point Syndicate transaction and the associated tax benefits.  Among other things, the PPM stated with respect to the contemplated conservation easement plan that:

a.   LCV Fund XVI was "formed to acquire, own and hold for investment a 98.99 interest in [HP Holdings]," which "is expected to obtain through a contribution by its current owners approximately 840 acres of real property located in Van Buren County and Warren County, Tennessee,

located near Fall Creek Falls State Park . . . , of which approximately all 840 acres will be available for the granting of a conservation easement."

b.   The "investment objectives" of LCV Fund XVI are to: "(i) preserve and protect the Capital Contributions of the Investor Members; (ii) "to realize possible capital appreciation in the value of the property," and (iii) subject to the approval of the managing member of [HP Holdings], the Manager and at least 50% of the percentage interest held by the Investor Members, [HP Holdings] may grant a conservation easement over the property and to generate federal and state income tax benefits."

c.   If the managing member of HP Holdings, the Manager, and at least 50% of percentage interests held by LCV Fund XVI members decide that HP Holdings will enter into a conservation easement with respect to the HP Parcel, LCV Fund XVI "will be entitled to claim conservation easement deductions (for Federal income tax purposes) (collectively, the 'Benefits') by virtue of its 98.99% interest in [HP Holdings.] The Benefits will be allocated by the Fund to its Members."

d.   HP Holdings "anticipates that either Foothills Land Conservancy or the Land Trust of Tennessee will be the recipient land trust. Both are authorized by the laws of the state of Tennessee to accept, hold and administer conservation easements.  Both the Foothills Land Conservancy and the Land

Trust of Tennessee have an established history of conserving property in Tennessee.  Prior to any proposal for a conservation easement, [HP Holdings] (and its managing member) will complete its due diligence of each organization and include the name of the chosen land trust in any such proposal, as well as additional background material on such land trust as to the cumulative acreage and number of properties currently under its administration."

e.   All aspects of LCV Fund XVI would be controlled and managed by Davis and Bush of Peachtree, both of whom were experienced fund managers and had closed or currently were involved in more than 20 other similar investment funds, including at least 10 other conservation easement transactions.

f.   The Manager of LCV Fund XVI, *i.e.*, Davis for HP Land Manager, "will be accountable to the Fund as fiduciary and consequently must exercise good faith and integrity in handling the Fund affairs.  This fiduciary duty is in addition to the duties and obligations of the Manager expressly set forth in the Fund Agreement.  The Fund Agreement provides that the Manager has the same fiduciary duties including the duties of care, loyalty and good faith, to the Fund and its members as are imposed upon the directors of a Delaware corporation."

91.     The PPM made specific reference to the Initial Appraisal prepared by the Tennille Defendants dated February 26, 2013 relating to 1,648.31 acres of Dixson's property which included the HP Parcel.  According to the Initial Appraisal, the market valuation of the 1,648.31 acres prior to the granting of the conservation easement was $19,780,000 and the value of the conservation easement $8,853,000.

92.     The PPM also made specific reference to the availability of a draft Legal Opinion of Bryan Cave with respect to the High Point Syndicate transaction and the Fund's intention to obtain a final tax opinion letter if the Fund chooses to donate a conservation easement.  The PPM represented that the Legal Opinion "will conclude that substantially more than half of the material Federal income tax benefits anticipated from such investment should be realized by the Fund."

93.     After sending the promotional materials, Carbonara also reached out to potential investors such as Peskin and Perkins to further explain the SCE Strategy. Carbonara arranged for and participated in a conference call as well as an in-person meeting with Peskin and Perkins during which Carbonara reiterated the misrepresentations and omissions in the Promotion Materials and specifically referred to the Bryan Cave Legal Opinion as supporting the legal merits of the SCE Strategy.

94.     Based on the promotional materials and Defendants' collective advice and representations concerning the legality and benefits of the High Point Syndicate

transaction, on or about April 12, 2013, Plaintiffs Peskin and Perkins each paid $200,000 to participate in the High Point Syndicate.

95.    In total, the Old Ivy Defendants and Peachtree Defendants sold to Plaintiffs Peskin and Perkins and the other High Point Syndicate members a 98.99% interest in HP Holdings for $1,712,500.

> **b.    The High Point Syndicate Votes to Place a Conservation Easement on the HP Parcel.**

96.    On August 14, 2013, HP Holdings acquired the HP Parcel through the series of transfers preplanned by Defendants and specifically directed by the Peachtree Defendants.  Specifically, Harper Branch, one of Dixson's wholly-owned LLCs that held the entire HP Parcel (and significant other acreage), contributed 51% of its undivided interest in the HP Parcel to HP Property Manager (the PropCo) in exchange for a 100% membership interest therein.  HP Property Manager then contributed its acquired 51% undivided interest to HP Holdings in exchange for a 50.999% membership interest therein. The remaining 49% of the undivided interest in the HP Parcel was contributed directly by Harper Branch to HP Holdings in exchange for a 49% membership interest therein. Through these transactions, HP Holdings obtained a 100% undivided interest in the HP Parcel and Dixson, through HP Property Manager and Harper Branch, retained 99.999% ownership of HP Holdings.  HP Land Manager retained ownership of the other .001% of HP Holdings.

97.     On October 25, 2013, Carbonara sent to Peskin, Perkins and the other High Point Syndicate members a purported development plan for the HP Parcel that had been prepared by the Peachtree Defendants.  The development plan proposed to develop the HP Parcel into a low-density residential equestrian community, which according to Carbonara, would entail "the development and sale of 201 lots, a clubhouse with pool and fireplace, and an equestrian center, which includes riding ring and training facility."  The plan included purported lot values, pro forma financials, maps, site plans and photographs of the proposed development. Carbonara indicated that a ballot would be issued in the coming weeks to determine whether the High Point Syndicate should pursue the development plan or the conservation proposal.

98.     On or about December 3, 2013, Carbonara issued to Peskin, Perkins and the other High Point Syndicate members a ballot to vote "for" or "against" the resolution to "approv[e] of the contribution of the conservation easement to Foothills Land Conservancy, a Tennessee non-profit organization, with respect to the [HP Parcel] by the Company pursuant to the terms of the Conservation Easement and Declaration of Restrictions and Covenants Agreement, in the form attached hereto as Exhibit A, is hereby approved."

99.     On or before December 12, 2013, the requisite percentage of the High Point Syndicate members voted "for" the resolution, *i.e.*, to donate the conservation

easement. Davis, as Manager, cast the formal ballot on behalf of the Fund. Davis, also as Managing Member, cast a ballot in favor of conservation on behalf of the Syndicate.

100.   On December 12, 2013, the Board of Directors for Foothills authorized the acceptance of the conservation easement donation from HP Holdings.

101.   On December 13, 2013, the Tennille Defendants submitted to Bush for HP Holdings an appraisal analysis for a 3,203.42 acre tract of land in Tennessee which included the HP Parcel (the "High Point Appraisal"). In the High Point Appraisal, the Tennille Defendants represented, among other things, that:

a.   The High Appoint Appraisal is a qualified appraisal pursuant to Section 1.170A-13(c) (3) of the Treasury Regulations and complies with USPAP and Appraisal Institute guidelines.

b.   Roberts is a qualified appraiser pursuant to Section 1.170A-13(c)(5) of the Treasury Regulations and due to his background, experience, education, and membership in the Appraisal Institute, is qualified to make appraisals of the type of property being valued. Roberts has received a Certification of Completion for the Valuation of Conservation Easement certification program on August 20, 2008, as offered by the American Society of Appraisers, the American Society of Farm Managers and Rural Appraisers, and the Appraisal Institute and endorsed by the Land Trust Alliance. Roberts

56

also has completed the Valuation of Conservation Easements education requirements and passed the examination.

c.   The fee charged for the High Point Appraisal was in no way related to the value reported and that the appraisal assignment was not made, nor rendered on the basis of a requested minimum valuation or specific valuation.

d.   The High Point Appraisal was prepared for use and submission to the IRS as evidence of the value of the charitable donation of a conservation easement. As an appraiser, Roberts understood that a substantial or gross valuation misstatement used in connection with a tax return may subject him to a civil penalty.

102.   With these representations, the Tennille Defendants concluded in the High Point Appraisal that the HBU of the subject property prior to the granting of the conservation easement is a low density residential parcel and that the market value was $38,441,000 (*i.e.*, nearly $12,000 per acre); the market value of the property, after the granting a conservation easement on the 840-acre HP Parcel would be $29,597,000 (*i.e.*, $9,239 per acre). Thus, according to the High Point Appraisal, the value of the conservation easement was $8,914,000, or the difference between the market values before and after the donation. Roberts expressly acknowledged that the High Point Appraisal was prepared for income tax purposes

and would be used to support a deduction by the taxpayer(s) donating the conservation easement.

103.   On December 27, 2013, the Foothills Defendants prepared a final Baseline Documentation Report ("the High Point BDR") for the benefit of HP Holdings and Foothills.  In the High Point BDR, the Foothills Defendants purported to set out the various conditions on the HP Parcel that would be preserved by the conservation easement and represented that the purpose of the easement was to retain forever these same conditions and to preclude any uses that would impair or interfere with the property's conservation values.  The Foothills Defendants represented that the conservation easement meets the purpose of the Foothills organization by conserving land, watershed, forestry, ecological and historical values, and also serves the open space, habitat protection, watershed protection, and offset of development pressure needs of Tennessee.  The contents of the High Point BDR were verified as accurate by HP Holdings as the conservation easement grantor and Clabough of Foothills for Foothills as the grantee.

104.   The Foothills Defendants, with the help of the Peachtree Defendants, also prepared the Conservation Easement and Declaration of Restrictive Covenants dated December 27, 2013 (the "High Point Deed") pursuant to which HP Holdings conveyed to Foothills the conservation easement with respect to the HP Parcel.  In the High Point Deed, HP Holdings incorporated the High Point BDR and further

certified that the HP Parcel possesses various conservation values, including ecological, natural, scenic, open space, and wildlife habitat values which further local, state, and national goals to conserve scenery and wildlife for future, public enjoyment.

105.   The High Point Deed, verified and signed by HP Land Manager as Manager of HP Holdings and Clabough of Foothills, was recorded on December 30, 2013 in both Van Buren and Warren Counties, Tennessee.

106.   On December 30, 2013, Foothills provided HP Holdings a letter acknowledging the conveyance of the conservation easement and representing that no goods or services were provided in exchange for the donation.

### c.   Warren Averett Prepares the High Point Syndicate Tax Returns and the High Point Syndicate Members' K-1s.

107.   As a result of the conservation easement donation to Foothills, HP Holdings purportedly received an allowable charitable contribution deduction of $8,914,000, which then flowed through and was allocated to each of the members in the High Point Syndicate, including Plaintiffs Peskin and Perkins, in proportion to each member's relative ownership interest in LCV Fund XVI.

108.   In or about March 2014, Warren Averett, together with the Tennille and Foothills Defendants, prepared the materials needed for the High Point Syndicate's 2013 tax returns.  Warren Averett prepared the tax returns for HP Holdings and LCV Fund XVI (Forms 1065), which reported charitable contribution deductions of

$8,914,000 and $8,823,969, respectively (the latter of which reflects LCV Fund XVI's 98.99% ownership of HP Holdings).

109.   Warren Averett also reviewed the documents that would be submitted along with Forms 1065, including the Form 8283 that the Tennille Defendants and the Foothills Defendants prepared.   In the Form 8283, the Tennille Defendants disclosed the appraised fair market value of the donated conservation easement as $8,914,000 as per their High Point Appraisal.   However, they did not disclose the date the donated property was acquired by the donor, how it was acquired by the donor, or the donor's cost basis of the HP Parcel.   Each of the fields requesting this information on the Form 8283 was left blank.   Furthermore, in the Form 8283 Supplemental Statement, the description of the donated property only disclosed the original purchases of the HP Parcel by Dixson in 2005 and 2008.   Nonetheless, Roberts of Tennille, as the real estate appraiser, verified the Form 8283 as accurate and signed it under penalties of perjury; Clabough on behalf of Foothills also verified and signed the same Form.   Warren Averett did not raise any concerns about these errors in the Form 8283, and used this and the other defective SCE Strategy documents received from the Peachtree Defendants to prepare the tax returns.

110.   In or about April 13, 2014, Warren Averett signed and filed the Forms 1065 for the HP Holdings and LCV Fund XVI, along with copies of the Form 8283,

For 8283 Supplemental Statement, High Point Appraisal, High Point BDR, and Foothills letter confirming the conservation easement donation.

111.   In addition, Warren Averett prepared and sent, often via the Old Ivy Defendants, the K-1s for each of the members of the High Point Syndicate, including Plaintiffs Peskin and Perkins.  The K-1s for each of the Syndicate members reported the charitable contribution deduction allocated to each of them in proportion to their membership interest in the High Point Syndicate.  Accordingly, the K-1 prepared for Plaintiffs Peskin and Perkins each reported $795,039 as their allocable share of the charitable contribution deduction from the High Point Syndicate transaction. Warren Averett advised Plaintiffs Peskin and Perkins that the information in their respective K-1 has been provided to the IRS and that they should report the indicated charitable contribution deduction amount on their individual tax returns for 2013 and Peskin and Perkins thus each did so.

112.   Although Warren Averett knew that the Peachtree Defendants were promoters of the High Point Syndicate transaction and received fees in their capacity as such, Warren Averett did nothing to confirm any of the values or information in the documents the Peachtree Defendants provided to support a charitable contribution deduction in the amount Defendants had predetermined.  As it was expected to do as the Accountant for the SCE Strategy, Warren Averett simply filled out the necessary forms by copying the relevant numbers from the High Point

Appraisal and attaching documents that it knew contained inaccuracies and misleading information.

> **d.** **The 2013 High Point Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

113.   On or about May 15, 2015, the IRS sent to HP Holdings c/o LCV a Notice of Beginning of Administrative Proceeding ("NBAP") indicating that HP Holdings' tax return for 2013 was selected for examination.

114.   Nearly a month later, on or about June 19, 2015, Carbonara sent to the High Point Syndicate members a letter advising them of the NBAP.  The letter, dated June 18, 2015 and signed by Bush as Manager of HP Land Manager, vaguely stated: "The impact of this examination to you, if any, will only be ascertainable upon completion of the IRS's examination of High Point Holdings.  We will notify you if any material events occur regarding the pending examination.  No action is required by you at this time.  This notice is solely for informational purposes."

115.   The Peachtree Defendants on behalf of HP Holdings engaged Bryan Cave to represent the High Point Syndicate in the IRS audit even though they knew that Bryan Cave had a serious conflict of interest since it, too, was a promoter of the SCE Strategy and directly worked with the other Defendants on nearly all aspects of the High Point Syndicate transaction.

116.   At the conclusion of the audit, on or about February 24, 2017, the IRS issued to HP Land Manager, the Tax Matters Partners of HP Holdings, a "Notice of Final Partnership Administrative Adjustment" ("FPAA") for the 2013 tax year. The FPAA indicated that the IRS was disallowing HP Holdings' charitable contribution deduction of $8,914,000 because the claimed deduction did not meet the requirements of Code § 170. The FPAA also indicated that the IRS would assess a 40% accuracy-related penalty under Code § 6662(h) because the underpayment of tax resulting from the disallowance of the charitable contribution deduction was attributable to a "gross valuation misstatement."

117.   None of the Defendants, including the Old Ivy Defendants, Peachtree Defendants or Bryan Cave, properly or fully informed Plaintiffs Peskin or Perkins, or any of the other High Point Syndicate members, about the progress or significance of the IRS audit or even disclosed the fact that the IRS had issued the FPAA.

> **e.   Bryan Cave, on Behalf of the High Point Syndicate, Pursues Litigation in Tax Court.**

118.   On May 16, 2017, Bryan Cave filed a petition on behalf of the High Point Syndicate in Tax Court challenging the adjustments proposed in the FPAA. *See High Point Holdings, LLC v. Commissioner of Internal Revenue*, No. 10896-17.

119.   On September 18, 2018, the IRS filed a motion for partial summary judgment in *High Point Holdings*, arguing that the charitable contribution claimed by the High Point Syndicate did not meet any of the requirements of Code § 170 or

the regulations promulgated thereunder, including specifically the failure of the High Point Deed to grant a restriction in perpetuity and to protect the property in perpetuity as required under Code §§ 170(h)(1)(C), 170(h)(2)(C), and 170(h)(5).

120.   On May 15, 2020, the Tax Court granted the IRS's motion for partial summary judgment, ruling that the claimed deduction was disallowed in its entirety.

121.   None of the Defendants, including the Old Ivy Defendants, Peachtree Defendants or Bryan Cave, adequately or otherwise informed Plaintiffs Peskin or Perkins, or any of the other High Point Syndicate members about the status or significance of the Tax Court proceedings.

**3.      The TOT Syndicate Transaction.**

     **a.      The Klaer Plaintiffs Participate in the TOT Syndicate Transaction.**

122.   As Defendants previously had agreed, another subdivision of Dixson's property which was adjacent to the High Point Parcel would be used to promote another SCE Strategy, the TOT Syndicate transaction.  The TOT Parcel totaled 652.16 acres in Van Buren County, Tennessee.  The conservation easement was to extend over 637.16 acres of the TOT Parcel (with three five-acre inholdings excluded).  Just as they did for the High Point Syndicate transaction, Defendants worked together to prepare all the necessary promotion and implementation items.

123.  In September and October 2013, the Peachtree Defendants again formed the various entities through which to promote and implement the TOT Syndicate transaction:

a.  Bush formed TOT Property Holdings, LLC ("TOT Holdings") as the Syndicate (on September 18, 2013).

b.  Bush formed PES Fund VI, LLC ("PES Fund VI"), as the Fund through which the TOT transaction participants would participate in the SCE Strategy (also on September 18, 2013).

c.  Bush formed TOT Land Manager, LLC ("TOT Land Manager") to serve as Manager and Tax Matters Partner of PES Fund VI and also as Managing Member of TOT Holdings (on September 5, 2013).

d.  Bush formed TOT Property Manager, LLC ("TOT Property Manger") as the PropCo (on October 29, 2013).

124.  Beginning in or about mid-October 2013, the Peachtree Defendants began to promote the TOT Syndicate transaction to potential participants, including to the Klaer Plaintiffs.  On October 11, 2013, Bush sent to Marie Klaer the promotional materials jointly prepared by the Peachtree Defendants, Tennille Defendants, Foothills Defendants and Bryan Cave.  Each of these Defendants collaborated with one another to prepare the promotional materials, with full knowledge and intent that the promotional materials would be used to promote and

sell the SCE Strategy to individual investors such as the Klaer Plaintiffs.   The promotional materials included the PES Fund VI PPM and several exhibits thereto, all prepared by Bryan Cave.

125.   The PES Fund VI PPM described in further detail the TOT Syndicate transaction and the associated tax benefits.  Among other things, the PPM stated with respect to the contemplated conservation easement plan that:

a.   PES Fund VI was "formed to acquire, own and hold for investment a 98.99% interest in [TOT Holdings]," which "is expected to obtain through a contribution by its current owners approximately 649 acres of real property located in Van Buren County, Tennessee, located near Fall Creek Falls State Park . . . , of which approximately all 649 acres will be available for the granting of a conservation easement."

b.   The "investment objectives" of PES Fund VI are to: "(i) preserve and protect the Capital Contributions of the Investor Members; (ii) "to realize possible capital appreciation in the value of the property," and (iii) "subject to the approval of the managing member of [TOT Holdings], the Manager and at least 50% of the percentage interest held by the Investor Members, [TOT Holdings] may grant a conservation easement over the property and to generate federal and state income tax benefits."

c.   If the managing member of TOT Holdings, the Manager, and at least 50% of percentage interests held by PES Fund VI members decide that TOT Holdings will enter into a conservation easement with respect to the TOT Parcel, PES Fund VI "will be entitled to claim conservation easement deductions (for Federal income tax purposes) (collectively, the 'Benefits') by virtue of its 98.99% interest in [TOT Holdings].   The Benefits will be allocated by the Fund to its Members."

d.   "TOT Holdings anticipates that either Foothills Land Conservancy or the Land Trust of Tennessee will be the recipient land trust.   Both are authorized by the laws of the state of Tennessee to accept, hold and administer conservation easements.   Both the Foothills Land Conservancy and the Land Trust of Tennessee have an established history or conserving property in Tennessee.   Prior to any proposal for a conservation easement, TOT Holdings (and its managing member) will complete its due diligence of each organization and include the name of the chosen land trust in any such proposal, as well as additional background material on such land trust as to the cumulative acreage and number of properties currently under its administration."

e.   All aspects of PES Fund VI would be controlled and managed by Davis and Bush of Peachtree, who both were experienced fund managers who

had closed or currently were involved in more than 20 other similar investment funds, including at least 10 conservation easement transactions.

f.   The Manager of PES Fund VI, *i.e.*, Davis for TOT Land Manager, "will be accountable to the Fund as fiduciary and consequently must exercise good faith and integrity in handling the Fund affairs.  This fiduciary duty is in addition to the duties and obligations of the Manager expressly set forth in the Fund Agreement.  The Fund Agreement provides that the Manager has the same fiduciary duties including the duties of care, loyalty and good faith, to the Fund and its members as are imposed upon the directors of a Delaware corporation."

126.   The PES Fund VI PPM made specific reference to the Initial Appraisal prepared by the Tennille Defendants dated September 16, 2013, relating to 2,363.42 acres of Dixson's property which included the 649-acre TOT Parcel.  According to the Initial Appraisal, the market valuation of the 2,363.42 acres prior to the granting of the conservation easement was $28,349,000 and the value of the conservation easement $6,879,000.

127.   The PPM also made specific reference to the availability of a draft Legal Opinion by Bryan Cave with respect to the TOT Syndicate transaction and the Fund's intention to obtain a final Legal Opinion if the Fund chooses to donate a conservation easement.  The PPM represented that the Legal Opinion "will conclude

that substantially more than half of the material Federal income tax benefits anticipated from such investment should be realized by the Fund." However, because the Legal Opinion for the TOT Syndicate transaction was not ready for distribution at the time Defendants began their marketing efforts, Bush used and sent a copy of Bryan Cave's Legal Opinion for the High Point Syndicate transaction. Bush represented that this Legal Opinion involved an adjacent property to the TOT Parcel and thus the substance would remain largely the same as what would be included in the eventual Legal Opinion for the TOT Syndicate transaction.

128.   Around the same time that Bush sent the promotional materials, Bush also spoke with the Klaer Plaintiffs about the merits of the SCE Strategy. Among other things, Bush represented that the SCE Strategy was supported by qualified, conservative appraisals as to the value of any conservation easement placed on subject property. Bush further represented that there were sufficient funds in the reserve to handle any potential IRS inquiries, though such inquiries were unlikely and any disputes would resolve in their favor since the Peachtree Defendants were very conservative, thorough, and well documented with respect to the SCE Strategy.

129.   Based on the promotional materials and Defendants' collective advice and representations concerning the legality of the TOT Syndicate transaction, on October 14, 2013, the Klaer Plaintiffs paid $100,000 to participate in the TOT Syndicate.

130.   In total, the Peachtree Defendants sold to the Klaer Plaintiffs and the other TOT Syndicate members a 98.99% interest in TOT Holdings for $1,720,000.

**b.     The TOT Syndicate Votes to Place a Conservation Easement on the TOT Parcel**

131.   On or about November 18, 2013, TOT Holdings acquired the TOT Parcel through the series of transfers preplanned by Defendants and specifically directed by the Peachtree Defendants.  To that end, Evergreen and Harper Branch, the two Dixson-owned LLCs that held the entire TOT Parcel (and significant other acreage), contributed 51% of their undivided interest in the TOT Parcel to TOT Property Manager in exchange for a 100% membership interest therein.  TOT Property Manager then contributed its acquired 51% undivided interest to TOT Holdings in exchange for a 50.88% membership interest therein.  The remaining 49% of the undivided interest in the TOT Parcel was contributed directly by Evergreen and Harper Branch to TOT Holdings in exchange for a 49% membership interest therein.  Through these transactions, TOT Holdings obtained a 100% undivided interest in the TOT Parcel and Dixson, through TOT Property Manager, Evergreen and Harper Branch, collectively retained 99.99% ownership of TOT Holdings (50.99%, 36.01%, and 12.99%, respectively).  TOT Land Manager retained its 0.01% interest in TOT Holdings.

132.   On December 6, 2013, Bush sent to the Klaer Plaintiffs and the other TOT Syndicate members a purported development plan for the TOT Parcel that had

been prepared by the Peachtree Defendants.  The development plan proposed to develop the TOT Parcel into a low-density residential equestrian community, which would entail the development and sale of 230 residential lots, a clubhouse with pool and fireplace, and an equestrian center that includes a riding ring, training facility and 4.2 miles of equestrian trails.  The plan included pro forma financials, maps, site plans and photographs of the proposed development.  In truth, however, no reasonable developer would have chosen to start a new residential development on the TOT Parcel in 2013.  New developments had come to an abrupt halt when the 2008-2009 recession arrived, and rural areas such as Van Buren County, Tennessee, were still making a slow recovery in 2013.  Indeed, any developer naturally would have focused on the previously failed developments near the TOT Parcel which already had much of the "leg work" completed (e.g., water, electricity, roadways), and not on the TOT Parcel itself where substantial capital would be required for a completely "ground up" construction.  Nevertheless, the Peachtree Defendants presented the development plan as a legitimate and potentially profitable option. Bush indicated in his email that a ballot would be sent by email in the coming weeks to determine whether the TOT Syndicate should pursue the development plan or the conservation proposal.

133.   On or about December 20, 2013, Bush sent to the Klaer Plaintiffs and other TOT Syndicate members a ballot to vote "for" or "against" the resolution to

"approv[e] of the contribution of the conservation easement to Foothills Land Conservancy, a Tennessee non-profit organization, with respect to the [TOT Parcel] by the Company pursuant to the terms of the Conservation Easement and Declaration of Restrictions and Covenants Agreement, in the form attached hereto as Exhibit A, is hereby approved."  Exhibit A was a copy of the TOT Deed prepared by the Foothills Defendants.

134.  On December 24, 2013, the requisite percentage of TOT Holdings members, including PES Fund VI, TOT Land Manager and TOT Property Manager, voted "for" the resolution, *i.e.*, to donate the conservation easement to Foothills. Davis signed the ballots on behalf of PES Fund VI and TOT Land Manager, as Manager and Managing Member of these entities, respectively.

135.  However, even before the ballots were in, the Peachtree, Foothills, and Tennille Defendants effected all of the implementation items needed to donate the conservation easement.  On December 10, 2013, three weeks after the initial transfer of the TOT Parcel to TOT Holdings, the Peachtree Defendants caused PES Fund VI to purchase from TOT Property Manager, Evergreen, and Harper Branch 98.99% of their collective 99.99% interest in TOT Holdings.  PES Fund VI paid $717,200 in cash and assumed the seller's obligations to make $322,000 in capital contributions, for a total consideration of $1,039,200.  TOT Property Manager retained a 1% interest and TOT Land Manger its initial 0.01% interest in TOT Holdings.

136.   On December 12, 2013, the Board of Directors for Foothills authorized the acceptance of the conservation easement donation from TOT Holdings.

137.   On December 16, 2013, the Tennille Defendants submitted to Bush for TOT Holdings an appraisal for a 2,363.42-acre land tract in Tennessee which included the TOT Parcel (the "TOT Appraisal").  In the TOT Appraisal, the Tennille Defendants represented, among other things, that:

a.   The TOT Appraisal is a qualified appraisal pursuant to Section 1.170A-13(c) (3) of the Treasury Regulations and complies with USPAP and Appraisal Institute guidelines.

b.   Roberts is a qualified appraiser pursuant to Section 1.170A-13(c)(5) of the Treasury Regulations and due to his background, experience, education, and membership in the Appraisal Institute, is qualified to make appraisals of the type of property being valued.  Roberts has received a Certification of Completion for the Valuation of Conservation Easement certification program on August 20, 2008, as offered by the American Society of Appraisers, the American Society of Farm Managers and Rural Appraisers, and the Appraisal Institute and endorsed by the Land Trust Alliance. Roberts also has completed the Valuation of Conservation Easements education requirements and passed the examination.

c.  The fee charged for the TOT Appraisal was in no way related to the value reported and that the appraisal assignment was not made, nor rendered on the basis of a requested minimum valuation or specific valuation.

d.  The TOT Appraisal was prepared for use and submission to the IRS as evidence of the value of the charitable donation of a conservation easement. As appraiser, Roberts understood that a substantial or gross valuation misstatement used in connection with a tax return may subject him to a civil penalty.

138.  With these representations, the Tennille Defendants concluded in the TOT Appraisal that the HBU of the subject property prior to the granting of the conservation easement was a low density residential parcel and that the market value was $28,361,000 (*i.e.*, nearly $12,000 per acre), and the market value of the property, after granting a conservation easement on the 637.16-acre TOT Parcel would be $21,434,000.  Thus, according to the TOT Appraisal, the value of the conservation easement was $6,927,000, or the difference between the two market values before and after the donation.  Roberts again expressly acknowledged that the TOT Appraisal was prepared for income tax purposes and would be used to support a deduction by the taxpayer(s) donating the conservation easement.

139.  On December 27, 2013, the Foothills Defendants finalized the Baseline Documentation Report ("the TOT BDR") for the benefit of TOT Holdings and

Foothills.  In the TOT BDR, the Foothills Defendants purported to set out the various conditions on the TOT Parcel that would be preserved by the conservation easement and represented that the purpose of the easement was to retain forever these same conditions and to preclude any uses that would impair or interfere with the property's conservation values.  The Foothills Defendants represented that the conservation easement meets the purpose of the Foothills organization by conserving land, watershed, forestry, ecological and historical values, and also serves the open space, habitat protection, watershed protection, and offset of development pressure needs of Tennessee.  The contents of the TOT BDR were verified as accurate by TOT Holdings as the conservation easement grantor and Clabough of Foothills for Foothills as the grantee.

140.   The Foothills Defendants, with the help of the Peachtree Defendants, also prepared the Conservation Easement and Declaration of Restrictive Covenants dated December 27, 2010 (the "TOT Deed") pursuant to which TOT conveyed to Foothills a conservation easement on 637.16 acres of the TOT Parcel (three five-acre inholdings on the TOT Parcel were excluded from the donation).  Again, the Foothills Defendants hired its own Board of Directors member to draft the TOT Deed even though the same Board member would eventually vote to approve or deny the donation from TOT Holdings.

141.   The TOT Deed specifically incorporated the conclusions of the Foothills Defendants' TOT BDR, including that the donation would serve various conservation purposes.  However, in direct contravention to the stated conservation interests, the Foothills Defendants knowingly permitted the Syndicate to reserve rights to conduct "commercial forestry . . . designed to allow for a sustained yield of forest products."  Among other things, commercial forestry on the TOT Parcel would endanger at-risk species and ruin scenic views of the woodland.  Yet the Foothills Defendants were more than willing to including in the TOT Deed provisions like this that were favorable to the Syndicate donor even if it meant allowing for destruction of or impairment to the stated conservation interests.

142.   The TOT Deed was verified and signed by TOT Property Manager as Manager of TOT Holdings and Clabough of Foothills and recorded on December 30, 2010 in Van Buren County, Tennessee.

143.   In a letter dated January 9, 2014, Clabough on behalf of Foothills, provided TOT Holdings written acknowledgment of the conservation easement donation pursuant to Section 170(f)(8) and instructed TOT Holdings to retain the letter for its tax records.  The Foothills Defendants also warranted that no goods or services have been or would be provided in exchange for the donation.

144.   In another letter dated January 9, 2014, Clabough on behalf of Foothills, sent to TOT Holdings an acknowledgment and receipt of a charitable contribution

for $24,252 on December 31, 2013. The Foothills Defendants again represented that no goods or services were given in exchange for the donation.

### c. Warren Averett Prepares the TOT Syndicate Tax Returns and the TOT Syndicate Members' K-1s.

145. As a result of the conservation easement donation to Foothills, TOT Holdings purportedly received an allowable charitable contribution deduction of $6,927,000, which then flowed through and was allocated to each of the members in the TOT Syndicate, including the Klaer Plaintiffs, in proportion to each member's relative ownership interest in PES Fund VI.

146. During the first quarter of 2014, Warren Averett, together with the Tennille and Foothills Defendants, prepared the materials needed for the TOT Syndicate's 2013 tax returns, including the tax returns for TOT Holdings and PES Fund VI (Forms 1065). For TOT Holdings, Warren Averett prepared two tax returns for 2013: one for the short period beginning September 18, 2013 and ending December 10, 2013 (*i.e.*, from LLC formation until syndication), and another for the short period beginning December 11, 2013 and ending December 31, 2013. Two tax returns were necessary because there was a technical termination of TOT Holdings when PES Fund VI acquired a 98.99% interest in TOT Holdings.

147. In the Form 1065 for the earlier 2013 short period, Warren Averett reported TOT Holdings' only assets to include $485,859 in land and $100 of cash, or total assets of $485,959.

148.   In the Form 1065 for the later 2013 short period, Warren Averett reported, among other things: TOT Holdings' total assets of $489,959 as of December 11, 2013; the subsequent purchase by PES Fund VI of a 98.99% interest in TOT Holdings for $717,200 in cash; and a charitable contribution deduction of $6,927,000 for a qualified conservation easement and $25,252 in cash to Foothills. In other words, Warren Averett reported a nearly ten-fold increase in value of the same land in under three weeks since PES Fund VI's 98.99% purchase of TOT Holdings.

149.   Meanwhile, the Form 1065 for PES Fund VI claimed a non-cash charitable contribution of $6,857,307, or five-and-a-half times the amount PES Fund VI paid for its interest in TOT Holdings just three weeks prior to the conservation easement donation.

150.   Warren Averett also reviewed the documents that would be submitted along with the Forms 1065, including the Form 8283 that the Tennille Defendants and the Foothills Defendants prepared. In the Form 8283, the Tennille Defendants disclosed the appraised fair market value of the donated conservation easement as $6,927,000 as per their TOT Appraisal.  However, they did not accurately disclose the other information requested and required in the Form 8283, including the date the donated property was acquired, how the donor acquired the property, or the donor's cost basis.  The Tennille Defendants and the Foothills Defendants referred

only to the original purchase of the TOT Parcel by Dixson in February 2008 for $585,859. Nonetheless, Roberts of Tennille, as the real estate appraiser, verified the Form 8283 as accurate and signed it under penalties of perjury; Clabough on behalf of Foothills also verified and signed the same Form. Warren Averett did not raise any concerns about the defective Form 8283 or the other supporting SCE Strategy documents provided to it by the Peachtree Defendants.

151.   In or about April 13, 2014, Warren Averett signed and filed both of TOT Holdings' Forms 1065 and PES Fund VI, along with copies of the Form 8283, TOT Appraisal, TOT BDR, and Foothills letters confirming the conservation easement donation and cash donation. for tax year 2013.

152.   In addition, Warren Averett prepared and sent, often via the Peachtree Defendants, the K-1s for each of the members of TOT Syndicate, including the Klaer Plaintiffs. The K-1s for each of the Syndicate members reported the charitable contribution deduction allocated to each of them in proportion to their membership interest in the TOT Syndicate. Accordingly, for the Klaer Plaintiffs, Warren Averett reported on their K-1 $398,393 as their allocable share of the charitable contribution deduction from the TOT Syndicate transaction. Warren Averett advised the Klaer Plaintiffs that the information in their K-1 had been provided to the IRS and that they should report the indicated charitable contribution deduction amount on their individual tax returns for 2013, and the Klaer Plaintiffs thus did so.

153.   The Klaer Plaintiffs and other TOT Syndicate members also included with their individual tax returns for 2013 the supplemental documents prepared by certain of the Defendants and sent by Bush on or about March 22, 2014, including the Form 8283, the Form 8283 Supplement, the recorded TOT Deed, the TOT Appraisal prepared by the Tennille Defendants, and the Foothills Defendants' written acknowledgment letters.

154.   Although Warren Averett knew that the Peachtree Defendants were promoters of the TOT Syndicate transaction and received fees in their capacity as such, Warren Averett did nothing to confirm any of the values or information in the documents the Peachtree Defendants provided to support a charitable contribution deduction in the amount Defendants had predetermined.  As it was expected to do as the Accountant for the SCE Strategy, Warren Averett simply filled out the necessary forms by copying the relevant numbers from the TOT Appraisal and attaching documents that it knew contained inaccuracies and misleading information.

> **d.**   **The 2013 TOT Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

155.   On September 23, 2014, the IRS sent to TOT Holdings, c/o Peachtree Defendants a Notice of Beginning of Administrative Proceeding ("NBAP") indicating that TOT Holdings' tax return for 2013 was selected for examination.

156.   A week later, on September 30, 2014, Bush finally informed the TOT Syndicate members, including the Klaer Plaintiffs, about the NBAP.  Bush attached a copy of the NBAP and a September 29, 2014 letter from Davis, as Tax Matters Partner and Manager, which vaguely stated: "The impact of this examination to you, if any, will only be ascertainable upon completion of the IRS's examination of TOT Property Holdings.  We will notify you if any material events occur regarding the pending examination.  No action by you is required at this time.  This notice is solely for informational purposes."

157.   The Peachtree Defendants, purportedly on behalf of TOT Holdings, engaged Bryan Cave to represent the TOT Syndicate in the IRS audit even though they knew that Bryan Cave had a serious conflict of interest since it, too, was a promoter of the SCE Strategy and directly worked with the other Defendants on nearly all aspects of the TOT Syndicate transaction.

158.   At the conclusion of the audit, on or about January 3, 2017, the IRS issued to Peachtree d/b/a TOT Land Manager, the Tax Matters Partners of TOT Holdings, an FPAA for the 2013 tax year.  The IRS also issued a copy of the same FPAA to Bryan Cave pursuant to power of attorney provisions (or other authorization on file with the IRS).  The FPAA indicated that the IRS was disallowing TOT Holdings' noncash charitable contribution deduction of $6,927,000 because the claimed deduction did not meet the requirements of Code §

170.  The FPAA also indicated that the IRS would assess a 40% accuracy-related penalty under Code § 6662(h) because the underpayment of tax resulting from the disallowance of the charitable contribution deduction was attributable to a "gross valuation misstatement."

159.  Despite what Davis previously had represented, none of the Defendants, including the Peachtree Defendants and Bryan Cave, properly or fully informed the Klaer Plaintiffs or any of the other TOT Syndicate members about the progress or significance of the audit, or even disclosed that the IRS had issued the FPAA.

> **e.    Bryan Cave, on Behalf of the TOT Syndicate, Pursues Litigation in Tax Court.**

160.  On March 7, 2017, Bryan Cave filed a petition on behalf of the TOT Syndicate in Tax Court challenging the adjustments proposed in the FPAA.  *See TOT Property Holdings, LLC, TOT Land Manager, LLC, Tax Matters Partner v. Commissioner of Internal Revenue*, No. 005600-17.

161.  The IRS maintained that TOT Holdings is not entitled to the claimed noncash charitable contribution deduction for at least three reasons: (i) the extinguishment valuation provision in the TOT Deed failed to make the donee absolutely entitled to the required proportionate share of extinguishment proceeds and thus failed the "in perpetuity" requirement of the Code; (ii) the TOT Deed reserved rights for commercial forestry on the TOT Parcel, thereby allowing uses

inconsistent with significant conservation interests, and (iii) TOT Holdings grossly inflated the value of the conservation easement.

162.   A few months after the petition in *TOT Property Holdings* was filed, in or about June 2017, Roberts of Tennille passed away.  Because one of the central issues in *TOT Property Holdings* involved a dispute over the fair market value of the conservation easement donated to Foothills, as appraised by the Tennille Defendants in the TOT Appraisal, the Peachtree Defendants and Bryan Cave agreed to retain another appraisal firm and appraisers, Martin H. Van Sant and Thomas F. Wingard, to serve as experts in defense of the TOT Appraisal.[10]

163.   On November 18-19, 2019, *TOT Holdings* proceeded to trial.  Bryan Cave did not—indeed, it could not—even attempt to defend the values in the TOT

---

[10] The Peachtree Defendants and Bryan Cave chose Van Sant and Wingard based on the appraisers' reputation as SCE Strategy "proponents" and prior experience with them in another case involving a Peachtree-sponsored SCE Strategy that went to trial in Tax Court.  *See Plateau Holdings, LLC v. Commissioner*, Docket No. 12519-16. There, too, the Tennille Defendants had prepared an appraisal that grossly overvalued the conservation easement donation (once again made to the Foothills Defendants) such that even the Petitioner's appraisal experts did not and could not come close to defending the nearly $25,500,000 deduction claimed.  In *Plateau Holdings*, Van Sant and Wingard posited a value of almost $16 million, or about $10 million less than the Tennille Defendants' figure (and not coincidentally, at a figure that, if accepted, would fall just shy of the gross valuation misstatement penalty). The Tax Court ultimately rejected these values, instead adopting the reasoning and findings of the IRS's appraisal expert who concluded that the value of the conservation easement donation was $2,695,000.  Van Sant and Wingard are named defendants in another SCE Strategy case pending in this court.  *See Hoover et al. v. Strategic Capital Partners, LLC, et al.*, No. 1:21-cv-01299-SDG (N.D. Ga.).

Appraisal prepared by the Tennille Defendants and which were used to claim the $6.9 million deduction on the Syndicate's tax return. Van Sant and Wingard opined that the value of the conservation easement donation of the TOT Parcel was $2,732,000, *i.e.*, at least ***$4,195,000 less*** than the value appraised by the Tennille Defendants (and even that lower value was regarded as inflated by the Tax Court).

164.   On November 22, 2019, the Tax Court issued a bench opinion, entering a decision in favor of the IRS. The Tax Court concluded that TOT Holdings' claimed deduction of $6.9 million for its donation of a conservation easement to Foothills should be denied in its entirety; the actual fair market value of the conservation easement was $496,000; and penalties are applicable. Specifically, the Tax Court found, among other things, that:

a.   The TOT Deed fails to protect the conservation purpose of the easement in perpetuity because the distribution of extinguishment proceeds clause is inconsistent with applicable regulations, and thus, does not comply with Code § 170(h)(5)(A)[11];

b.   As of December 2013, before the conservation easement at issue, the HBU of the TOT Parcel was recreational and timber harvesting, not residential development, and the fair market value was $1.128 million.

---

[11] Although the IRS had raised several grounds for denying the claimed deduction, the Tax Court found dispositive its "in perpetuity" finding and thus declined to discuss the other errors infecting the TOT Syndicate transaction.

Indeed, any residential development on the TOT Parcel would be "highly unlikely" given the property's characteristics and the failures of several other nearby attempted developments;

c.  As of December 2013, after the conservation easement at issue, the HBU of the TOT Parcel remained recreational use and timber harvesting, and the fair market value of the TOT Parcel encumbered by the easement was $632,000.  Thus, the easement value was $496,000, not $6,927,000 as claimed by the Tennille Defendants in their TOT Appraisal and also not $2,732,000 as claimed by Van Sant and Wingard in their appraisal prepared for trial;

d.  The gross valuation misstatement penalty of 40% is applicable to the underpayment attributable to the "grossly exaggerated" valuation misstatement;

e.  TOT Holdings abandoned any effort to establish a reasonable cause and good faith defense under Code § 6664(c) as to any portion of its underpayment.[12]  According to the Tax Court, there was "good reason" for this, as there was no evidence that TOT Holdings actually relied on any

---

[12] Section 6664(c)(1) provides that the accuracy related penalty shall not be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and the taxpayer acted in good faith with respect to it.

professional advice or that it made a good faith investigation of the value of the donation before claiming the deduction.

165.   Neither the Peachtree Defendants nor Bryan Cave provided any contemporaneous information to the TOT Syndicate members about *TOT Property Holdings*, including that Bryan Cave had filed a petition in Tax Court, the case was proceeding to a trial, or the bench opinion was issued in favor of the IRS.

166.   Indeed, it was not until March 8, 2020, or several months after the *TOT Property Holdings* bench opinion had been issued and with the deadline to appeal approaching, that the Peachtree Defendants finally decided to inform the TOT Syndicate members about the proposed next steps to file an appeal to the Eleventh Circuit.  Bush inaccurately represented that the Tax Court's ruling was based solely on another Tax Court ruling now under appeal and that he saw no option other than to appeal to avoid having the entire charitable contribution deduction disallowed and a 40% penalty imposed.

167.   On March 12, 2020, Bryan Cave on behalf of TOT Holdings filed its notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit.  On appeal, TOT Holdings did not just challenge the Tax Court's decision regarding the noncompliance of the extinguishment proceeds clause in the TOT Deed, but also the Tax Court's valuation finding, arguing that the HBU before the donation of the easement on the TOT Parcel was a residential development.

168.   On June 23, 2021, the Eleventh Circuit affirmed all aspects of the Tax Court's decision in *TOT Property Holdings*. Among other things, the Eleventh Circuit called Bryan Cave's assertions on behalf of TOT Holdings regarding the property and easement's values as "dubious" and held that TOT Holdings failed "woefully" to demonstrate any error with the Tax Court's valuation findings which were supported by "overwhelming evidence."

**E.     The SCE Strategy Was Fatally Flawed.**

169.   The IRS has concluded, and the Tax Court and U.S. Court of Appeals has confirmed in the last two years, that the SCE Strategy was fatally flawed from the outset. The documents Defendants prepared in order to promote, sell and implement the SCE Strategy, including the Appraisal, Appraisal Summary, Conservation Easement Deed, Baseline Documentation Report, and tax returns, were strewn with errors and failed to meet the specific requirements set out in the Code.  Each of the Defendants, as purported experts in their respective fields and specifically in conservation easements, was aware or should have been aware of these errors and defects in each of the documents discussed herein.  And each of the defects were sufficient, standing alone, to invalidate the SCE Strategy and result in the disallowance of the charitable contribution deductions taken by each of the Plaintiffs and Class members in reliance on the representations, assurances, and actions of Defendants.

170.   It was not reasonable to expect that Plaintiffs and the Class were knowledgeable and they were not, in fact, knowledgeable about complex matters such as conservation easements and the associated tax issues with such transactions. Indeed, that is why Plaintiffs and the Class relied on and trusted Defendants and the Other Participants who at all times represented themselves as the purported experts. Plaintiffs and the Class detrimentally relied on Defendants and the Other Participants and upon Defendants' and the Other Participants' repeated unequivocal representations that the SCE Strategy would generate a completely legal charitable contribution deduction pursuant to Code § 170(h).

### 1.   The SCE Strategy Purposely Used Sham Appraisals that Violated USPAP and the Code in Numerous Respects.

171.   The primary factor in appraising a conservation easement is the comparison of the property's fair market value before and after the contribution of a conservation easement based on the property's HBU, defined as the reasonable and probable use that supports the highest present value of the property.  Accordingly, the Appraisals were the lynchpin of the SCE Strategy and were egregiously inflated and defective to advance the goals of Defendants' scheme.

172.   The Tennille Defendants represented to Plaintiffs and the Class that they were professional, qualified appraisers who would provide independent and objective valuations of the conservation easements generated by the SCE Strategy based on their independent determination of the HBU for each subject property.  The

Peachtree Defendants, Old Ivy Defendants, Foothills Defendants and Bryan Cave each affirmed the Tennille Defendants' purported qualifications and independence, including in the promotional materials and the final transaction documents they jointly prepared, reviewed and/or approved.  By relying on the Appraisal and Appraisal Summary (Form 8283) in preparing and filing the necessary tax returns for the Syndicate and the Fund, as well as directing Plaintiffs and the Class to do the same in their individual tax returns, Warren Averett likewise conveyed to Plaintiffs and the Class that the Tennille Defendants and their valuations were legitimate.

173.   In reality, however, as each of the Defendants knew, the Tennille Defendants' Appraisals were a complete sham.  The Tennille Defendants were chosen to participate in the SCE Strategy because they were willing to issue grossly inflated appraisals.  The Peachtree Defendants directed the Tennille Defendants as to the valuation they needed to reach and the Tennille Defendants employed improper methodologies to do so.  In these regards, the Tennille Defendants completely shirked their professional duties and obligations and instead willingly went along with what the Peachtree Defendants directed.  None of the Defendants ever disclosed to Plaintiffs and the Class the Tennille Defendants' conflicts of interest and complete dereliction of their professional duties and obligations.

174.   To arrive at the valuations that the Peachtree Defendants directed, and to ensure they continued to enjoy the lucrative fees paid for these Appraisals, the

Tennille Defendants were grossly negligent and intentionally deceitful in each of the Appraisals by making inappropriate assumptions, utilizing inappropriate methodologies, and using various flawed techniques to improperly inflate the value of the conservation easements.  For example, a critical element of the bogus Appraisals was the insupportable finding of HBU for the subject properties.  The HBU endorsed by the Tennille Defendants facilitated the false premise that a property owner suffers "lost profits" by foregoing a hypothetical and implausible HBU by donating the property to a conservation organization.  Such "lost profits" analysis, however, is inconsistent with the actual test in determining fair market value: the willing-buyer-willing-seller test using the before- and after-valuations of the subject property as required in Treasury Regulation § 1.170A-1(c)(2).  To concoct a HBU that would support the valuation that Defendants sought to successfully sell the SCE Strategy, the Tennille Defendants made false assumptions and ignored convenient facts that enabled them to determine a HBU for properties for which no objective and competent appraise would concur.

175.   The foregoing and other chicanery employed by the Tennille Defendants resulted in grossly inflated values, which in turn, caused Plaintiffs and the Class to unknowingly claim inflated and improper tax deductions arising from their participation in the SCE Strategy.  By way of example, the Tennille Defendants committed, *inter alia*, the following errors in their Appraisals for the SCE Strategy:

a.   Utilizing "comparable sales" that were not in fact comparable;

b.   Inaccurately reporting the data from the comparable sales that were used;

c.   Ignoring the sales of actual easements in reaching their valuation;

d.   Failing to conduct any financial feasibility analysis, supply and demand analysis, or reasonable probability analysis as required by applicable Code provisions and related regulations;

e.   Failing to address the additional requirement that the highest and best use be "reasonably probable";

f.   Failing to consider flaws of the property;

g.   Valuing the subject property, which was raw, undeveloped land, as if it was already developed property;

h.   Failing to consider existing legal or regulatory restrictions on the development and/or use of the subject property;

i.   Failing to properly apply the principle of substitution in valuing the land at its "highest and best use";

j.   Improperly acting as an advocate rather than as an independent appraiser; and

k.   Violating numerous standards set by the USPAP, including:

(i)     Not communicating assignment results with the intent to mislead or to defraud;

(ii)    Not performing an assignment in a grossly negligent manner;

(iii)   Not allowing the intended use of an assignment or a client's objectives to cause the assignment results to be biased;

(iv)    Not committing a substantial error of omission or commission that significantly affects an appraisal;

(v)     Not rendering appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results; and

(vi)    Not properly analyzing and reporting sales history and related information in the appraisal.

176.   More specifically with respect to the High Point Appraisal, and by way of example only:

a.   The HP Parcel was not suited for the stated HBU of residential development, but instead recreational and timber harvesting;

b.   There was no consideration of the fact that several other residential developments previously had been attempted around the HP Parcel that had largely failed, *see infra* ¶ 177.d);

c.   There was no master plan, approved plat plan, market study, or a discounted cash flow projection, many of which would normally accompany a residential development proposal;

d.   Incomparable sales of properties with various amenities from regions hundreds of miles away were used when there were more than adequate comparable sales near the HP Parcel; and

e.   Unwarranted market condition adjustments were made in favor of a higher valuation whereas the continuing effects of the 2008-2009 recession on the real estate market, particularly on rural areas such as where the HP Parcel was located, were not taken into account.

177.   Similarly, with respect to the TOT Appraisal, and by way of example only:

a.   The TOT Parcel was not suited for the stated HBU of residential development, but instead recreational and timber harvesting;

b.   The TOT Parcel was located in a rural, undeveloped area with no nearby population centers or attractive physical features that might suggest residential development;

c.   The TOT Parcel was located on a former artillery range and there was no report or other confirmation provided representing that the property had been cleared of munitions, which is a very expensive but necessary undertaking in the event of any residential development;

d.   There was no consideration of the fact that there were several other residential developments previously attempted around the TOT Parcel that had largely failed.  For instance, Overton Retreat, located about five miles from the TOT Parcel, enjoyed early success but never fully recovered once the 2008-2009 recession hit; there were only a handful of sales between 2009 and 2013, leaving more than one-third of the land undeveloped.  Meanwhile, Isha Village, which had been platted in 2006 or 2007, had no sales until 2017.  And Indian Trails never had any infrastructure built and was reputed to be a Ponzi scheme;

e.   Incomparable sales of properties with various amenities from regions hundreds of miles away were used when there were more than adequate comparable sales near the TOT Parcel, including the various sales of the TOT Parcel itself; and

f.   Unwarranted market condition adjustments were made in favor of a higher valuation whereas the continuing effects of the 2008-2009 recession

on the real estate market, particularly on rural areas such as where the TOT Parcel was located, were not taken into account.

178.   With these numerous errors, the Tennille Defendants (pursuant to the direction and with the assistance of the other Defendants) overstated the fair market value of the conservation easements by millions of dollars, which in turn resulted in Plaintiffs and the Class unknowingly grossly overstating their tax deduction.

179.   In addition, none of the Defendants ever disclosed to Plaintiffs and the Class that Roberts of Tennille was suspended previously for his role in preparing various sham appraisals prior to the Appraisal he performed for the High Point Syndicate and TOT Syndicate.

180.   In light of the Tennille Defendants' purported professional experience and education, they knew or should have known that the manner in which they valued the conservation easements was contrary to the regulations promulgated by the IRS, violated the professional standards for real estate appraisers, including USPAP, and resulted in gross valuation overstatements for the easements they appraised.

181.   Under Code § 170(f)(11), a charitable contribution deduction from the donation of a conservation easement must be supported by a "qualified appraisal." A "qualified appraisal" is one that "is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other

guidance prescribed."  The numerous egregious errors identified above, beginning with the fact that the Tennille Defendants allowed the Peachtree Defendants to dictate the values needed in the Appraisals, sufficiently demonstrate that their Appraisals had no chance of satisfying the requirements for a "qualified appraisal". And all of the Defendants, particularly the Tennille Defendants, knew or should have known that the IRS would take the position that the charitable contribution deductions generated from the SCE Strategy should be disallowed on that basis alone.

182.   In sum, the Tennille Defendants knowingly prepared the Appraisals for use by the Peachtree Defendants and Old Ivy Defendants in marketing and selling the SCE Strategy to Plaintiffs and the Class and knowingly allowed these and the other Defendants to improperly guide and direct the Appraisals for this purpose.  In addition, the Tennille Defendants knew that the High Point Syndicate, TOT Syndicate and other SCE Strategy Syndicates would attach their Appraisal and Appraisal Summary (Form 8283) to the tax returns of the Syndicate and the Syndicate members, as required by the Code, to substantiate the charitable contribution deductions reported by the Syndicates and ultimately claimed by Plaintiffs and the Class on their individual tax returns.

### 2. The Conservation Easement Deeds Were Improperly Prepared and Violated the Code's Specific Requirements.

183. The Conservation Easement Deeds were prepared by the Foothills Defendants with full knowledge of the requirements under the Code and related Regulations for a legal and legitimate conservation easement donation. Despite this knowledge and the explicit nature of the requirements of the Code and the IRS's related Regulations, the Foothills Defendants failed to prepare the Conservation Easement Deeds to conform to the Code and applicable Regulations. As a result, the SCE Strategy failed to generate legitimate and legal charitable contribution deductions for Plaintiffs and the Class.

184. In order for a conservation easement donation to comply with the Code, it must be perpetual, as required by § 1.170A-14(g)(6)(i) of the Treasury Regulations. Thus, a conservation easement donation may only allow permitted uses of the landowner's retained interests that are consistent with the "conservation purposes" set out in the Conservation Easement Deed. Here, the Conservation Easement Deed for the Plaintiffs' SCE Strategy transaction permitted retained uses by the landowners that were inconsistent with the stated conservation purposes, and thus, on this basis alone, failed to satisfy the perpetuity requirement, as well as the requirement that the conservation easement donation be exclusively for conservation purposes.

185.   A conservation easement donation also can fail to satisfy the perpetuity requirement when the sales proceeds clause in the Conservation Easement Deed does not ensure that the donee (*i.e.*, Foothills) would receive an amount on any sale of the property at least equal to its proportionate share based on the amount of the charitable deduction as compared to the value of the entire property at the time of the donation.  In drafting the Conservation Easement Deeds for the SCE Strategy, the Foothills Defendants made critical errors by deviating from the specific requirements of the IRS regulation specifying how sales proceeds should be allocated in the event of a sale or condemnation.  This resulted in another failure to meet the perpetuity requirement.

186.   The Foothills Defendants took the lead in drafting the Conservation Easement Deeds, but worked closely with the Peachtree Defendants in doing so. They were aware that Plaintiffs and the Class desired for the conservation easement donation to result in a legal and legitimate tax deduction and this is what Defendants had promised through the SCE Strategy.  Plaintiffs and the Class relied on the Foothills Defendants' experience and expertise in effectuating and implementing the SCE Strategy for a valid tax deduction, including in drafting the Conservation Easement Deeds.

**3.      The Appraisal Summary (Form 8283) Violated the IRS's Clear Requirements.**

187.    In furtherance of and pursuant to the conspiracy among Defendants and the Other Participants, the Tennille Defendants and Foothills Defendants prepared and signed the required Appraisal Summary (Form 8283), which was then reviewed and submitted by Warren Averett to the IRS to substantiate the charitable contribution deductions claimed on the tax returns for the Syndicate and its members. Warren Averett, either directly or through the Peachtree Defendants and/or the Old Ivy Defendants, also provided copies of the Form 8283 to Plaintiffs and the Class to submit with their individual returns to substantiate the charitable contribution deductions resulting from the SCE Strategy.  Each of these Defendants knew or should have known that the Appraisal Summary was being used for this purpose.

188.    In the Appraisal Summary, the Tennille Defendants reported to the IRS the valuation of the conservation easements from the SCE Strategy based on their Appraisal even though they knew that the valuation provided therein was grossly overstated.

189.    The Tennille Defendants also did not report the cost basis of the property on which the conservation easement had been placed, or reported a misleading figure.  For instance, in the Appraisal Summary for the High Point Syndicate transaction, the Tennille Defendants left this information completely

blank.  And for the TOT Syndicate transaction, the Tennille Defendants reported the 2005 purchase price paid by Dixson, the landowner, but not the much more recent 2013 purchase price paid by the Syndicate members.  The Tennille Defendants did not provide an explanation that would constitute reasonable cause for not providing this information or providing the wrong information in the accompanying Supplemental Statement for either transaction.

190.  The Tennille Defendants also reported the wrong or no information about the date and manner by which the donor acquired the subject property.  For the High Point Syndicate transaction, the Tennille Defendants again left the information blank, and for the TOT Syndicate transaction, they put date and manner by which the original landowner—not the Syndicate—acquired the subject property.  The Tennille Defendants did not provide an explanation that would constitute reasonable cause for not providing this information or providing the wrong information in the accompanying Supplemental Statement for either transaction.

191.  The Tennille Defendants, as well as the Foothills Defendants and Warren Averett, knew that if the Appraisal Summary does not report the cost basis of the property or the date and manner of donor acquisition, or does so inaccurately, the claimed deductions from the SCE Strategy will be summarily disallowed for failure to properly substantiate the deduction.  This requirement was codified as early as 1984.  The Tennille Defendants' failure to provide the cost basis of the

property or to provide the correct cost basis and other required information in the Appraisal Summary was an intentional omission or misrepresentation intended to conceal the inflated nature of the Appraisals. For the same reason, neither the Foothills Defendants nor Warren Averett ever requested that the Tennille Defendants properly complete the Appraisal Summary and instead rubber-stamped the patently defective form. Specifically, the Tennille Defendants and Foothills Defendants verified and signed the Form 8283, and Warren Averett submitted it to the IRS. Each of these Defendants knew that Plaintiffs and the Class did not know or understand the requirements of the Appraisal Summary and that the document would appear in good order to them, especially since it had been reviewed and executed by several purportedly independent professionals.

### 4. The Baseline Documentation Reports Were Grossly Deficient.

192. Where a donor of a conservation easement retains rights to the property subject to the easement, which could impair the conservation interests, the donor is required to document the condition of the property at the time of the gift, commonly referred to as the "baseline documentation," in a way that presents an accurate representation of the protected property at the time of the transfer.

193. The Baseline Documentation Reports prepared by the Foothills Defendants were deficient in numerous respects and failed to satisfy the IRS's documentation requirements. These deficiencies include (i) relying on the

Appraisals that the Foothills Defendants knew were a sham to support the conservation value of the subject property, and (ii) failing to sufficiently substantiate an exclusive conservation purpose.

194. Based on the Foothills Defendants' experience and expertise in conservation easements and their knowledge of the sham nature of the Appraisals and the numerous problems with the stated conservation purpose for each of the SCE Strategy transactions, there is no reasonable explanation for these Defendants' failure to properly prepare the Baseline Documentation Reports other than an intentional or grossly negligent act of deceit. The Foothills Defendants knew these deficiencies would result in Plaintiffs and the Class claiming charitable contribution deductions on their individual tax returns that the IRS would claim were invalid.

**5. The Bryan Cave Legal Opinions Contained Numerous Misrepresentations and Omissions.**

195. Bryan Cave prepared the Legal Opinion in connection with the High Point Syndicate transaction in which Plaintiffs Peskin and Perkins participated as well as the TOT Syndicate Transaction in which the Klaer Plaintiffs participated. The Legal Opinion for both transactions, like all other Legal Opinions that Bryan Cave prepared for each SCE Strategy, was generated from a "cookie cutter" template for which Bryan Cave merely needed to enter certain transaction-specific but non-substantive fields. The Legal Opinions did not differ in any material, substantive way for each SCE Strategy transaction. The Peachtree Defendants knew this since

at times they provided copies of an already drafted Legal Opinion for a particular SCE Strategy transaction when promoting another SCE Strategy transaction.

196.   In its Legal Opinion, Bryan Cave expressly stated that it was acting as special tax counsel to the Managing Member of the Syndicate, an entity formed and controlled by the Peachtree Defendants, and that the purpose of the Legal Opinion was to provide the Syndicate as well as its members an opinion concerning the material federal income tax aspects of the Syndicate acquiring an interest in the subject property and granting a conservation easement on it.

197.   Bryan Cave represented that the Legal Opinion was "**DRAFTED TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTION(S) OR MATTER(S) ADDRESSED IN THE OPINION**" and that the Legal Opinion was a "marketed opinion" pursuant to United States Treasury Department Circular 230 ("Circular 230").  This meant that Bryan Cave is required to: (1) determine the facts, (2) relate the facts to the law, (3) evaluate all of the significant federal tax issues and reach a conclusion with respect to each such issue, and (4) reach an overall conclusion regarding the tax treatment of the transaction.  A marketed opinion could not be issued unless Bryan Cave could conclude that the taxpayer will prevail on the merits with respect to each significant federal tax issue considered in the Legal Opinion at a confidence level of at least more likely than not.

198.   In rendering its Legal Opinion with respect to the federal and state income tax aspects of the SCE Strategy, including the availability of federal income tax deductions pursuant to Code § 170(h), Bryan Cave represented that it had examined numerous documents, including the Appraisal, the Baseline Documentation Report, the Conservation Easement Deed, and other transactional documents (several of which Bryan Cave itself had drafted for the Peachtree Defendants).

199.   Bryan Cave affirmed that in preparing the Legal Opinion, it had complied with all of the requirements of Circular 230. Bryan Cave further affirmed that it is not a "disqualified tax advisor," and therefore, the Syndicate members may rely on the Legal Opinion for purposes of the operation of the penalty and reporting provisions of the Code.

200.   Despite the fact that Bryan Cave purported to have obtained all relevant facts, reviewed all transaction documents, and analyzed all applicable laws and regulations (and despite the fact that Bryan Cave played a key role in actually drafting many of the transactional documents for the SCE Strategy transactions), the Legal Opinion stated that the contribution of the easement by the Syndicate to Foothills will qualify for the Qualified Conservation Contribution provided by Code § 170(h) and will not be reduced pursuant to Code § 170(c).  Furthermore, the amount of the contribution will equal the value of the Syndicate member's share of

the reduction in value of the property, which amount should not be limited by the basis of the Syndicate member's interest in the Fund.

201.   After providing approximately 35 pages of technical legal analysis of the SCE Strategy transactions, Bryan Cave concluded that "the material federal income tax benefits attributable" to the SCE Strategy "should" be realized by the individual Syndicate members.

202.   Based on Bryan Cave's legal expertise and the many years of advice and services it performed for the Peachtree Defendants specifically in connection to the SCE Strategy, Bryan Cave was aware (or should have been aware) of the numerous fatal defects, problematic issues and deficiencies identified by the IRS with respect to the SCE Strategy and that these issues and deficiencies were not consistent with Bryan Cave's conclusions in its Legal Opinion.  Bryan Cave chose not to discuss or disclose any of these fatal defects, issues and deficiencies in the Legal Opinion.

203.   Bryan Cave also failed to disclose to Plaintiffs or any other member of the Class that it was not an independent law firm, but was rather part of Defendants' conspiracy to develop, promote, sell, and implement the SCE Strategy.

**F.   Defendants Fraudulently Conceal the Truth About the SCE Strategy.**

204.   None of the above-described fatal flaws which doomed the SCE Strategy from the very outset were ever disclosed to Plaintiffs and the Class.  At all

relevant times, Defendants represented the SCE Strategy to Plaintiffs and the Class as a legitimate tax-savings investment that would generate legal tax deductions by way of a conservation easement donation.  Plaintiffs and the Class detrimentally relied on Defendants' expertise in conservation easements and tax matters.

205.   In addition to the misrepresentations and omissions that Defendants made in promoting, selling and implementing the SCE Strategy, Defendants continued to work together to keep hidden the truth about the SCE Strategy as the IRS made clear its intent to disallow the deductions generated therefrom.

### 1.   Defendants Conceal the Truth About the IRS Audits.

206.   Other than the Peachtree Defendants and/or the Old Ivy Defendants providing a bare notification letter to the Syndicate members that the IRS had issued a NBAP with respect to their transactions, none of the Defendants ever disclosed the significance of this development, including that several other Peachtree-sponsored SCE Strategy transactions for earlier tax years already were under audit and that they expected the IRS to audit later year transactions as well.

207.   In fact, by the time of the High Point and TOT Syndicate transactions, Defendants all knew that NBAPs would be forthcoming since the transactions they promoted and implemented in earlier tax years were being examined already by the IRS.

208.   In addition, none of the Defendants, including the Peachtree Defendants, which served as the Tax Matters Partner of the Syndicates, or Bryan Cave, which was purporting to represent the Syndicates, properly provided or fully disclosed any updates to the Syndicate members about the progress of the IRS audit, or even notified them when the IRS issued the FPAAs.

209.   For example, when certain TOT Syndicate members inquired about the status of the IRS audit, the Peachtree Defendants represented that there were no material developments.  Even as late as March 2016, the Peachtree Defendants represented that there was no update on the IRS audit, that the audit was a slow process, and that they were not even sure whether the IRS had started the audit.  In truth, the IRS audit had been ongoing and active.

210.   There is no reasonable explanation for Defendants' omissions in this regard other than their agreement to conceal the truth about the SCE Strategy, particularly since both the Peachtree Defendants and Bryan Cave had a duty to disclose to their respective clients and both were intimately involved in the IRS proceedings and purporting to take good-faith positions on their behalf.

**2.      Defendants Conceal the Truth About the Tax Court Proceedings.**

211.   Defendants, including the Peachtree Defendants, Old Ivy Defendants, and Bryan Cave, also did not properly provide full or accurate information to Plaintiffs or the Class regarding the Tax Court proceedings they decided to file on

behalf of each of the Syndicates, or keep them apprised of material developments that had an indisputable impact on their proceedings.

212.   Defendants deliberately kept quiet about the Tax Court proceedings even though they knew that they would receive adverse rulings, particularly since the Tax Court had been issuing unfavorable decisions in other SCE Strategy cases, including those which involved other Peachtree-sponsored transactions.

213.   For instance, in July 2017, the Tax Court issued its decision in *RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1 (Jul. 3, 2017), which made clear to Defendants that the failure to report the cost basis on Form 8283 such as in the High Point Syndicate transaction put any such transaction in almost certain danger of failing.  In September 2018, the Tax Court then issued its decision in *Belair Woods, LLC v. Commissioner*, T.C. Memo 2018-159, the death knell for any transaction in which the cost basis was not reported on Form 8283.   Defendants knew the significance of both *RERI Holdings* and *Belair Woods*, but they failed to inform Plaintiffs or any Class member that these cases doomed any transactions in which the Form 8283 failed to properly report the cost basis of property on which the conservation easement was placed.

214.   Defendants also knew that the Tax Court would decide against the Syndicates due to the defects in the Conservation Easement Deed, including its failure to protect the conservation purpose in perpetuity.  In September 2016, the

Tax Court held that materially identical language in the deed at issue there was contrary to the requirements of Code § 170 and the regulations promulgated thereunder and warranted disallowing the charitable contribution deduction in full. *PBBM-Rose Hill, Ltd. v. Commissioner*, No. 26096-14, Bench Opinion (Order of Service of Transcript dated Oct. 6, 2016), *aff'd* 900 F.3d 193 (5th Cir. 2018). The Tax Court thereafter directly applied the reasoning and holding of *PBBM-Rose Hill* in *Coal Property Holdings, LLC v. Commissioner*, 153 T.C. 7 (Oct. 28, 2019), to fully disallow the charitable contribution deduction claimed by the Syndicate therein. And one month later, in November 2019, the Tax Court reached the same conclusion in *TOT Property Holdings*, No. 05600-17, Bench Opinion (Order of Service of Transcript dated Nov. 22, 2019). Bryan Cave represented the Syndicates in both *Coal Property Holdings* and *TOT Property Holdings*, which involved other SCE Strategy transactions that the Peachtree Defendants had sponsored and pursuant to which the conservation easements were donated to Foothills.

215. When certain TOT Syndicate members happened to read about the *TOT Holdings* Tax Court ruling in news articles, the Peachtree Defendants characterized the holding as an "unprecedented move" that was based solely on a mere technicality in the TOT Deed. According to the Peachtree Defendants, "many groups of interested parties" were lined up to challenge this "suspect" ruling and they stated

that the ruling will not stand up on appeal.  Of course, the Tax Court ruling was affirmed.

216.   Just as they did in the IRS audit proceedings, both the Peachtree Defendants and Bryan Cave completely evaded their duty to disclose the truth to Plaintiffs and the Class about the Tax Court proceedings and that the positions asserted on their behalf were not in good faith or at all meritorious.

## 3. Defendants Conceal the Truth About Material Developments Concerning the SCE Strategy.

217.   On December 23, 2016, the IRS published Notice 2017-10, which identified the SCE Strategy as a "listed transaction" and thereby required promoters and participants to affirmatively tell the IRS of their involvement.  None of the Defendants contemporaneously informed the High Point or TOT Syndicate members of the significance of the Notice and its clear applicability to the very transactions they had participated in.

218.   Instead, on or about March 23, 2017, when the Peachtree Defendants sent the TOT Syndicate members copies of their respective K-1s for the 2016 tax year, Bush stated that, as the members "may be aware," Notice 2017-10 "designates certain donations of conservation easements and substantially similar transactions as 'listed transactions'" and "is retroactive to transactions dating back as far as 2010." Bush further stated that as "a member of an entity that participated in a listed transaction in a prior year, you are required to file a Form 8886 Reportable

Transaction Disclosure Statement with the Office of Tax Shelter Analysis by June 21, 2017," or pay a minimum penalty of $10,000 per form not filed.  Bush advised that on or about June 1, 2017 he would send a copy of TOT Holdings' Form 8886 for the members to copy in order to the file with their individual tax returns.

219.   About one week later, on March 31, 2017, when the Old Ivy Defendants sent the High Point Syndicate members copies of their respective K-1s for the 2016 tax year, Carbonara recycled the message Bush had been sending to other Syndicate members, namely that as the members "may be aware," Notice 2017-10 requires them to file a Form 8886 (Reportable Transaction Disclosure Statement) by June 21, 2017, or pay a penalty.  Carbonara indicated that he would send a copy of the Form 8886 for "you/your CPA to copy" and to file with their respective individual tax returns.

220.   When asked by any of the Syndicate members about Notice 2017-10, both the Old Ivy Defendants and Peachtree Defendants attempted to downplay its significance.   For instance, Bush, through Carbonara, advised that there was substantial opposition from conservation easement professionals to the filing requirement and that the Notice could be rescinded prior to the tax return filing deadline. Bush accordingly advised Syndicate members against filing their tax returns early and recommended that they seek an extension. Carbonara also added that he and other conservation easement professionals, including certain land trusts,

were effectively persuading Congress to urge the Treasury Department to suspend the Notice.

221.  While sending the diluted and misleading message to Syndicate members that the Notice is "no big deal" and only means the filing of an additional form with their tax returns, the Peachtree Defendants clearly understood the significance of the SCE Strategy being designated as a "listed transaction."  In fact, once the Notice was issued, the Peachtree Defendants internally concluded that they should no longer promote the SCE Strategy because they did not want to be associated with such transactions.  They never disclosed this fact to any of the Plaintiffs or other members of the Class.

222.  Instead, the Old Ivy Defendants and Peachtree Defendants continued to convey the same diluted and misleading message to the Syndicate members. In early June 2017, instead of sending copies of the Form 8886 as they previously had indicated, Bush and Carbonara represented there was a "strong likelihood" that the filing requirement would "disappear completely" by the extended filing deadline of October 2, 2017.  They therefore recommended against filing early and advised that the Peachtree Defendants would not send out sample Form 8886s until late August 2017.

223.  Ultimately, Notice 2017-10 was not rescinded, and in fact, on July 28, 2017, the IRS sent to the Peachtree Defendants a reportable transaction number to

provide to the TOT Syndicate members.  (While discouraging the TOT Syndicate members from timely complying with their filing requirements, in or about May 3, 2017, the Peachtree Defendants filed with the IRS a completed Form 8918 (Material Advisor Disclosure Statement), disclosing the "TOT Property Holdings LLC-SCE" as a reportable transaction.)  The Peachtree Defendants did not notify Plaintiffs of this fact until a few days prior to the extended October 2, 2017 filing deadline.  On September 28, 2017, Bush sent Syndicate members, including the Klaer Plaintiffs, a copy of the Form 8886 that needed to be filed with their individual tax return.

### 4.     Defendants Conceal the Truth About the IRS Settlement Offer.

224.   On June 25, 2020, given the IRS's success in challenging the SCE Strategy and other similar syndicated conservation easement transactions in Tax Court, including several sponsored by the Peachtree Defendants such as *Coal Property Holdings* and *TOT Property Holdings* (which not only resulted in the disallowance of the charitable contribution deduction but also imposed a 40% penalty for a gross valuation misstatement), the IRS proposed a time-limited settlement offer for those with SCE Strategy litigation currently pending Tax Court.

225.   On July 10, 2020, the IRS sent Bryan Cave the terms of the settlement offer for various SCE Strategy transactions that Bryan Cave was defending in Tax Court, including the High Point Syndicate transaction.

226.   Several weeks later, on or about August 4, 2020, Carbonara sent the High Point Syndicate members a notification letter from Bush advising them of the IRS's settlement offer.  However, the subject line of Carbonara's email stated: "LCV Fund XVI – Little Creek Property Holdings – IRS Terms of Settlement" and attached the IRS settlement offer sent in connection with *Little Creek Property Holdings, LLC v. Commissioner*, No. 24485-16.  Little Creek was yet another SCE Strategy that had been designed, promoted and implemented by the Old Ivy, Peachtree, Tennille and Foothills Defendants, and also was being defended by Bryan Cave in Tax Court. While the Old Ivy and Peachtree Defendants had confused their various SCE Strategy transactions, they intended their communication for the High Point Syndicate members and the terms of the IRS settlement offer pertained to their transaction as well.

227.   In the notification letter, Bush generally stated that the High Point Syndicate transaction had been selected to receive the IRS settlement offer and that the Syndicate members should review the attached offer and vote to accept or rejected the proposed terms.

228.   Later that same day, due to the number of questions coming in about the IRS settlement, Carbonara sent a lengthier follow-up communication from Bush and Davis addressed to the High Point Syndicate members.  According to Bush and Davis, the "primary issue" for the IRS was a technical one concerning whether the

language used in the Conservation Easement Deed protects the property in perpetuity. However, Bush and Davis warned that even if they won this issue on appeal, the issue of valuation still needed to be resolved as well as any other "technical" points. Bush and Davis falsely claimed that the IRS is giving no regard to the HBU provision in Code § 170. As Bush and Davis knew, particularly given the string of IRS victories against numerous SCE Strategy transactions, including the very transactions they themselves had designed, promoted and implemented, the IRS was uncovering the truth about Defendants' manipulation of the HBU to support their predetermined valuations.

229. With the "handwriting on the wall," the Old Ivy and Peachtree Defendants recommended that the High Point Syndicate members vote to accept the IRS settlement. They never disclosed that the IRS had given ample notice before this point that the real issue with the SCE Strategy was not merely a technical one, but the fraudulent and unlawful ways in which conservation easement professionals and advisors were abusing these transactions for their own improper gain.

## V.
## CONSPIRACY ALLEGATIONS

230. As set out more fully throughout this Complaint, each of the Defendants and the Other Participants involved in the SCE Strategy (collectively, the "Co-Conspirators") that Plaintiffs and the Class participated in, conspired with one another to design, promote, sell, and implement the SCE Strategy for the purpose of

receiving and splitting substantial fees (the "Co-Conspirators' Arrangement"). The receipt of those fees was the Co-Conspirators' primary, if not sole, motive in the development and execution of the SCE Strategy. The amount of fees earned by the Co-Conspirators was not tied to or reflective of the amount of time and effort they expended in providing professional advice and services. The Co-Conspirators designed the SCE Strategy and unlawfully agreed to provide a veneer of legitimacy to each other's opinions on the lawfulness and tax consequences of the SCE Strategy.

231. The Co-Conspirators entered into the Co-Conspirators' Arrangement, whereby they agreed and had a meeting of the minds that they would work together as a team to develop, market, sell and implement the SCE Strategy. Each of the Co-Conspirators agreed to, and carried out particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the SCE Strategy, as described in paragraphs 4-5, 8-10, 46-111, 115, 117, and 121-229 herein.

232. The Co-Conspirators each had a financial, business and property interest in inducing the Plaintiffs and the Class to enter into the SCE Strategy and to do so, fraudulently promised, opined and assured that the SCE Strategy would legally reduce Plaintiffs' and the Class's income taxes. Furthermore, the Co-Conspirators' Arrangement gave each of the participating Co-Conspirators a significant pecuniary interest in the advice and professional services they rendered.

233.  The Co-Conspirators conspired to perpetrate a fraud on Plaintiffs and the Class and to breach duties and/or to aid and abet the breach of duties owed to Plaintiffs and the Class, each with knowledge of the object of the conspiracy.  In addition, the Co-Conspirators authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Co-Conspirators.  Each Co-Conspirator committed at least one overt act in furtherance of the unlawful conspiracy.

## VI.
## CLASS ACTION ALLEGATIONS

234.  Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(l)(A), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide class of all persons (the "Class") defined below against all Defendants:

> All Persons, from January 1, 2011 to the present, inclusive, (i) who have been assessed back-taxes, penalties, and/or interest (via a settlement with the IRS, an amended tax return renouncing the SCE Strategy deduction and accepted by the IRS, a final Tax Court decision, or a Notice of Computational Adjustment from the IRS), or (ii) for which the IRS has made its final determination (via a Statutory Notice of Deficiency or FPAA) that the person (via the entity through which he/she participated in the SCE Strategy) is liable for back-taxes, penalties, and/or interest, as a result of their involvement, either directly or indirectly through an ownership stake in another entity, in a SCE Strategy designed, marketed, sold, implemented or managed by the Peachtree Defendants, the Foothills Defendants or any of their respective affiliates. Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, affiliates, partners, and employees; anyone receiving referral fees from the SCE Strategy transactions;

federal governmental entities; the Other Participants; the Other Participants' parents, subsidiaries, affiliates, partners, and employees; any entity or individual receiving referral fees from the SCE Strategy transactions; and federal government entities.

235.   Plaintiffs believe the Class consists of hundreds of Class members geographically dispersed throughout the United States such that joinder is impracticable.   These Class members may be identified from information and records maintained by Defendants or third parties.

236.   Plaintiffs and the Class members each and all have tangible and legally protectable interests at stake in this action.

237.   The claims of Plaintiffs and the Class have a common origin and share a common basis. The claims of all Class members originate from the same fraudulent transaction predicated by the Defendants.

238.   Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class. Thus, the class representatives have been the victims of the same illegal acts as each member of the Class.

239.   If brought and prosecuted individually, each of the Class members would necessarily be required to prove the instant claim upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

240.   The claims and remedial theories pursued by Plaintiffs are sufficiently aligned with the interests of the Class to ensure that the universal claims of the

alleged Class will be prosecuted with diligence and care by Plaintiffs as representatives of the Class.

241.   There are questions of law and fact common to the alleged Class. Such common questions include, *inter alia*:

      a.   Whether Defendants and the Other Participants defrauded Plaintiffs and the Class by advising and recommending that they engage in an illegal and abusive tax shelter, the SCE Strategy, and then implementing same on their behalf;

      b.   Whether Defendants and the Other Participants defrauded Plaintiffs and the Class by representing that they had obtained a Qualified Appraisal from a Qualified Appraiser and that the valuation of the subject property and conservation easement donation provided therein was legitimate;

      c.   Whether Defendants and the Other Participants defrauded Plaintiffs by advising Plaintiffs and the Class that all or a portion of the "value" of the donated property interest as set out in the respective Appraisals was deductible as a charitable contribution under the Code;

      d.   Whether Defendants and the Other Participants defrauded Plaintiffs and the Class by advising them that the charitable contribution deductions from the SCE Strategy would comply with Code § 170(h) and therefore would reduce the taxable income of Plaintiffs and the Class;

e.   Whether Defendants and the Other Participants defrauded Plaintiffs and the Class by advising them that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and court decisions;

f.   Whether Defendants and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein;

g.   Whether Defendants and the Other Participants engaged in a pattern of racketeering activity in violation of RICO and/or Georgia's RICO statute, codified at O.C.G.A. §§ 16-4-1, *et seq.*, based on the unlawful acts alleged herein;

h.   Whether Defendants' and the Other Participants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting, based on the unlawful acts alleged herein, resulted in or proximately caused and continues to directly cause injury to Plaintiffs' and the Class's business or property or irreparably harmed and harms Plaintiffs and the Class, and if so, the appropriate relief to which they are entitled;

i.   Whether Defendants' and Other Participants' actions, based on the unlawful acts alleged herein, constitute mail and/or wire fraud; and

j.   Whether Defendants and Other Participants have been unjustly enriched through the unlawful acts alleged herein.

242.    Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which could establish incompatible standards of conduct for the parties opposing the Class.  Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class. Furthermore, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions. Plaintiffs also allege questions of law and fact applicable to the Class that predominate over individual questions and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule 23(b)(3). Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

243.   The named individual Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

244.   The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class members. The proposed representatives will undertake to well and truly protect the interests of the absent Class members.

245.   The named Plaintiffs have engaged the services of counsel indicated below.  Plaintiffs' counsel are experienced in complex litigation, including class action litigation involving *inter alia* tax issues and will adequately prosecute this action and will assert, protect and otherwise represent well the named Class representatives and absent Class members.

246.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. There will be no difficulty in the management of this action as a class action.

247.   Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class members.

## VII.
## ALLEGATIONS RELATING TO RICO AND GEORGIA RICO

248.   Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1964(c) and O.C.G.A. § 16-14-6(c).

249. At all times relevant hereto, each of Plaintiffs and Defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

## A.    Enterprise

250. An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

251. In this case, the enterprise ("Enterprise") for RICO and Georgia RICO purposes consists of (1) Defendants; (2) the Other Participants; and (3) all other persons and entities that associated to solicit persons to participate in the SCE Strategy for the purpose of generating and sharing fees and commissions generated from the SCE Strategy and alleged tax liability reduction it purported to provide.

252. These individuals and entities individually and through their agents represented to their victims that the charitable contribution deduction purportedly generated by the SCE Strategy arose from a *bona fide* conservation easement entitling Plaintiffs and Class members to a noncash charitable contribution deduction under Section 170(h) of the Code and relevant regulations. In reality, the noncash charitable contribution deductions purportedly generated by the SCE Strategy did not qualify as legitimate tax deductions under the Code, and the SCE Strategy, as structured, could not support the promised tax benefits. The SCE Strategy and the Co-Conspirators' Arrangement to design, promote, sell, and implement it by means of the numerous fraudulent acts and omissions set out herein were devised solely to

facilitate the generation of significant fees and commissions to the Defendants without regard to the best interests of their clients, Plaintiffs and the Class. Defendants and the Other Participants have made millions of dollars orchestrating the Co-Conspirators' Arrangement.

253.   Defendants sought out as clients those persons, like Plaintiffs and other Class members, that had high taxable income and sufficient cash flow available to participate in the Syndicates.  Defendants then capitalized on the Co-Conspirators' Arrangement to convince these clients, by means of the numerous fraudulent acts and omissions set out herein, to execute the SCE Strategy, for the primary purpose of providing significant revenue for themselves.  Unbeknownst to Plaintiffs and the Class, there was no legitimate basis for the large noncash charitable contribution deductions resulting from highly inflated appraisals essential for the success of the Co-Conspirators' Arrangement that purportedly supported the value of the deductions generated by the SCE Strategy.

254.   Defendants and the Other Participants engaged in a common and mutual fraudulent plan, transaction and course of conduct described herein in connection with the design, promotion, sale and implementation of the SCE Strategy.  Defendants and the Other Participants knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as a fraud upon Plaintiffs and the Class, the primary purpose and effect of which was to generate

huge fees and commissions by fraudulently selling a series of transactions under the guise of generating a legal and legitimate noncash charitable contribution deduction.

255.   In connection with their involvement in the SCE Strategy, the Defendants and the Other Participants shared a purpose, relationship, and longevity sufficient to permit them to pursue the Enterprise's purpose. Specifically, the purpose of the Enterprise was for Defendants and the Other Participants to generate and share fees and commissions generated from the SCE Strategy. They accomplished this purpose by, among other things, rendering services to Plaintiffs in connection with designing, promoting, selling and implementing the SCE Strategy irrespective of whether the SCE Strategy complied with applicable laws, rules, and professional standards.

256.   As described more fully in paragraphs 5 and 53-79 herein, the Peachtree Defendants shared relationships with each of the other Defendants and Other Participants.   These relationships enabled all of the Defendants and the Other Participants to, among other things, (1) promote the SCE Strategy to new clients, (2) organize and operate the LLC entities necessary to implement the SCE Strategy, (3) advise Plaintiffs on the steps necessary to implement the SCE Strategy, (4) advise Plaintiffs on the tax treatment and purported tax benefits of the SCE Strategy, (5) obtain appraisals for the property interests donated as part of the SCE Strategy, (6) prepare tax returns, K-1s and other tax forms for the SCE Strategy, and (7) advise

Plaintiffs on how to respond to IRS scrutiny of the SCE Strategy. The Enterprise also had longevity. It lasted from at least 2011-2020, during which time the Enterprise committed, among other things the predicate acts described more fully in paragraphs 264-282 herein.

257. While Defendants and the Other Participants participated in the Enterprise and were a part of it, Defendants and the Other Participants also had an existence separate and distinct from the Enterprise.

258. Defendants and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

259. Defendants and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

**B.    Operation of the RICO Enterprise**

260. Each of the Defendants were vital to the implementation of the SCE Strategy, played an important role in the success of the Enterprise, and either controlled the Enterprise or knowingly implemented the decisions of others in the Enterprise, as detailed above in paragraphs 4-5, 8-10, and 46-233229.

261.   Defendants intended to commit wire and/or mail fraud in connection with the design, promotion, sale and implementation of the SCE Strategy because the IRS has made it clear to professional advisors, including Defendants, that it intends to disallow any deductions for conservation easement donations implemented in the manner the SCE Strategy was implemented.   Defendants' conduct was not consistent with ordinary, lawful business practices because Defendants' conduct violated IRS guidance, federal law, and professional standards such as USPAP appraisal standards.   Defendants' racketeering activity in designing, promoting, selling, and implementing the SCE Strategy involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

262.   Unfortunately, the IRS has disallowed the charitable deductions at the partnership (*i.e.*, the Syndicate) level and made clear its intent to also disallow the charitable contribution deductions at the individual level and assess Plaintiffs and the Class with back taxes, interest, and penalties for the underpayment of taxes due to filing tax returns reflecting the promised tax benefits of the SCE Strategy. Moreover, the Plaintiffs and the Class have incurred and will continue to incur substantial amounts of accounting and legal fees in connection with the audits and tax court proceedings regarding their individual tax returns and their related partnership tax returns.

263.   Plaintiffs and the Class, who were fully reliant on the advice and representations of the credentialed professionals like Defendants, were "collateral damage" of the Co-Conspirators' scheme to extract huge fees and commissions. Plaintiffs were fully reliant on Defendants and the Other Participants and trusted they were being advised, counseled and directed by professionals who represented themselves as having the requisite expertise and experience in these technical conservation easement transactions. At all times, Defendants and their co-conspirators assured Plaintiffs they were in full compliance with the applicable IRS rules and regulations, and other applicable legal requirements.

## C.    Predicate Acts

264.   With respect to the activities alleged herein, Defendants and the Other Participants acted at all times with malice toward Plaintiffs and the Class, intending to engage in the conduct complained of for the benefit of Defendants and their co-conspirators and with knowledge that such conduct was unlawful.  Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs and the Class, as well as the laws to which Defendants and their co-conspirators are subject, the same amounting to actionable wantonness.

265.   With respect to the activities alleged herein, each Defendant and each of their co-conspirators agreed to the operation of the transaction or artifice to deprive Plaintiffs and the Class of property interests.   In furtherance of these

agreements, each of them also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which Defendants were not entitled.

266.   With respect to the overt acts and activities alleged herein, each Defendant conspired with each other and the Other Participants to violate 18 U.S.C. § 1962(c) and O.C.G.A. § 16-4-4(b), all in violation of 18 U.S.C. § 1962(d) and Georgia law, respectively.  Each Defendant agreed and conspired with each other Defendant, their co-conspirators, to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which Defendants and their co-conspirators were not entitled.

267.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by Defendants and their co-conspirators designed to defraud Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs and Class members have and continue to suffer losses as a result of these activities.   The acts that caused injuries to Plaintiffs and Class members were performed for financial gain.

268.   In carrying out the overt acts and fraudulent transactions described above, Defendants and their co-conspirators engaged in, *inter alia*, conduct in

violation of federal laws, including 18 U.S.C. §§ 1343-1346, and 18 U.S.C. § 1961 *et seq.*, and state laws, including O.C.G.A. § 16-4-3(5)(C).

269.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: § 1341 (relating to mail fraud), § 1343 (relating to wire fraud) and § 1346 (relating to scheme or artifice to defraud).

270.   Section 16-4-3(5)(C) of the Official Code of Georgia Annotated provides that "racketeering activity" means, *inter alia*, "any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961(1)."

**D.     Violations of 18 U.S.C. §§ 1341 and 1343.**

271.   Plaintiffs repeat and reallege paragraphs 264-270 as if fully set forth herein.

272.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, Defendants and their co-conspirators, in violation of 18 U.S.C. §§ 1341 and 1343, transmitted and received by wire and/or mail matter and things therefrom including but not limited to contracts, instructions, correspondence, and other transmittals.

273.   Defendants' and their co-conspirators' violations of 18 U.S.C. §§ 1341 and 1343 are too numerous to list exhaustively.  By way of illustration but not

limitation, Plaintiffs provide the following representative examples of predicate acts related to these 18 U.S.C. §§ 1341 and 1343 violations:

a.   On October 11, 2013, Bush emailed Marie Klaer the promotional materials for the TOT Syndicate transaction, which included the misrepresentations and omissions set forth above;

b.   On October 25, 2013, Carbonara of Old Ivy sent an email to High Point Syndicate members describing and attaching the purported development plan for the HP Parcel despite knowing that Defendants had designed the SCE Strategy for tax deduction purposes only and that an actual development was neither intended nor feasible;

c.   On December 3, 2013, Carbonara of Old Ivy sent an email to High Point Syndicate members containing a ballot to cast a vote to determine whether the High Point Syndicate should pursue the conservation plan or development plan despite knowing that Defendants had designed the SCE Strategy to accommodate only the former;

d.   On December 6, 2013, Bush of Peachtree emailed Marie Klaer and other TOT Syndicate members a copy of the purported development plan for the TOT Parcel, despite knowing that Defendants had designed the SCE Strategy for tax deduction purposes only and that an actual development was neither intended nor feasible;

e.   On December 20, 2013, Bush of Peachtree emailed Marie Klaer and other TOT Syndicate members a ballot to cast a vote to determine whether the TOT Syndicate should pursue the conservation plan or development plan, despite knowing that Defendants had designed the SCE Strategy to accommodate only the former plan, and also attached a copy of the draft TOT Deed prepared by the Foothills Defendants containing the misrepresentations and omissions set forth above;

f.   On January 9, 2014, Clabough of Foothills sent a letter to TOT Property Holdings, LLC acknowledging the donation of a conservation easement on the TOT Parcel and falsely representing that no goods or services have been or will be provided by Foothills as consideration for the grant of the easement;

g.   On January 9, 2014, Clabough of Foothills sent a letter to TOT Property Holdings acknowledging its charitable contribution of $25,252 in cash and falsely representing that no goods or services were given in exchange for this donation;

h.   On March 22, 2014, Bush of Peachtree emailed Marie Klaer and other TOT Syndicate members a cover letter from Warren Averett addressed to the respective Syndicate member and enclosing the K-1 it had prepared containing the misrepresentations and omissions set forth above;

i.   On March 22, 2014, Bush of Peachtree emailed Marie Klaer and the other TOT Syndicate members a link to the supplemental information to be filed with their respective K-1s from PES Fund VI, including a completed Form 8283, Form 8283 Supplemental Statement, the TOT Appraisal, the TOT BDR, the TOT Deed, and the two January 9, 2014 letters from Foothills to TOT Property Holdings, each and all of which contained the misrepresentations and omissions set forth above;

j.   On September 30, 2014, Bush of Peachtree emailed the TOT Syndicate members a copy of the NBAP and a letter from Davis, the Tax Matters Partner of PES Fund VI, regarding the NBAP and containing the misrepresentations and omissions detailed above;

k.   On June 19, 2015, Carbonara of Old Ivy sent an email to High Point Syndicate members advising of the IRS issuing a NBAP and attaching a copy of the NBAP and a June 18, 2015 letter from Bush regarding same and containing the misrepresentations and omissions set forth above;

l.   On March 23, 2017, Bush of Peachtree emailed Klaer a copy of the 2016 K-1 from the Klaer Plaintiffs' 2013 investment in PES Fund VI and advised of the issuance of Notice 2017-10 in a misleading manner as detailed above;

m. On May 1, 2017, by U.S. mail, Peachtree sends to the IRS a completed Form 8918 (Material Advisor Disclosure Statement);

n. On July 11, 2017, Pattie Tennille of Tennille sends a letter to Bush for TOT Property Holdings, disclosing that the IRS has issued to Roberts, a material advisor as defined in Section 6111, a reporting transaction number for appraisals completed in 2013;

o. On August 28, 2017, Bush of Peachtree sent an email to TOT Syndicate members the material advisor numbers for Peachtree and Tennille without advising of the significance of this information;

p. On September 18, 2017, Bush of Peachtree sent an email to TOT Syndicate members a substantially completed Form 8886 relating to the TOT Syndicate transaction without advising of the significance of this information;

q. On March 8, 2020, Bush of Peachtree sent an email to TOT Syndicate members setting up a conference call to discuss the next steps given the Tax Court ruling in favor of the IRS and falsely describing the ruling as based solely on a technical issue;

r. On August 4, 2020, Carbonara of Old Ivy sent an email to High Point Syndicate members advising them of the IRS settlement offer and requesting a vote on whether to accept or reject the proposed terms;

s.   On August 4, 2020, Carbonara of Old Ivy sent an email to High Point Syndicate members providing further information from Bush and Davis regarding the IRS settlement offer;

t.   On December 2, 2020, Bush sent an email to High Point Syndicate members discussing the next steps in the settlement process with the IRS;

u.   All Appraisals prepared by the Tennille Defendants on property owned by any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of their affiliates and sent by email or mail to any potential or actual member of such Syndicate, including without limitation, the February 26, 2013 and December 13, 2013 appraisals for the High Point Syndicate transaction, and the September 16, 2013 and December 16, 2013 appraisals for the TOT Syndicate transaction.;

v.   All Legal Opinions prepared by Bryan Cave and transmitted to the Peachtree Defendants and Old Ivy Defendants for use in the promotional materials, and also transmitted by email to any potential or actual members in any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of its affiliates;

w.   All Schedule K-1s, including without limitation, the K-1s for tax year 2013 prepared by Warren Averett for members of any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of their affiliates;

x.  All template Form 8886s sent by email or mail from the Peachtree Defendant or Old Ivy Defendants to any member of any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of their affiliates;

y.  All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of their affiliates regarding the promotion of the SCE Strategy;

z.  All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of their affiliates regarding the implementation of the SCE Strategy;

aa. All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of their affiliates regarding the audit of any such Syndicate;

bb. All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of their affiliates regarding the Tax Court proceedings regarding any such Syndicate's SCE transaction; and

cc. All other mailed or emailed communications between any of the Defendants or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by the Peachtree Defendants or any of their affiliates regarding the IRS settlement initiative or other settlement offered to any such Syndicate.

274.   Each of the documents that Defendants and their co-conspirators sent by wire and/or mail to Plaintiffs and Class members served at least two roles in the Enterprise.   First, many of these documents, standing alone, were fraudulent as described in paragraphs 5, 8-10, 51-79, 84-92, 96-111, and 169-203. Defendants and their co-conspirators knew the tax treatment contemplated by their communications was inaccurate.   Second, all of these documents were used to advance the fraudulent scheme that Defendants and their co-conspirators perpetrated on Plaintiffs and the Class.   They were intended to lend the appearance of legitimacy to the SCE Strategy, as Defendants knew none of the Plaintiffs or any of the Class members had the expertise to understand the actual substance or significance of the documents other than that these documents were necessary to implement the SCE Strategy.

275.   Defendants' and their co-conspirators' efforts in connection with executing or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without

limitation acts done in violation of 18 U.S.C. §§ 1341 and 1343, also fall within the definition of racketeering activity under O.C.G.A. § 16-4-3(5)(C).

276.   In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs and the Class as described above, in violation of 18 U.S.C. §§ 1341 and 1343. These various communications are related to the purpose of misrepresenting the basis, terms and consequences of the SCE Strategy and were directed to Plaintiffs and the Class.  Further, the similarity in the misrepresentations over a period of time plausibly indicates participation by Defendants in the fraudulent enterprise. These acts, in addition to false and fraudulent misrepresentations communicated outside the interstate wire and mail systems, also fall within the definition of racketeering activity under O.C.G.A. § 16-4-3(5)(C). Defendants' and their co-conspirators' fraudulent statements and omissions include but are not limited to the following:

(1)      Orchestrating, from a tax standpoint, the design, development, implementation, operation, and management of the SCE Strategy;

(2)      Advising Plaintiffs and the Class members to engage in the SCE Strategy in order to receive favorable tax benefits;

(3)     Advising and recommending that Plaintiffs and Class members engage in an illegal and abusive tax shelter;

(4)     Failing to advise Plaintiffs and Class members that the SCE Strategy was an illegal and abusive tax shelter;

(5)     Failing to disclose existing applicable authority that indicated the purported tax benefits of the SCE Strategy were improper and not allowable for federal income tax purposes because of the failure of the SCE Strategy to strictly conform to Code § 170(h);

(6)     Advising Plaintiffs and Class members that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(7)     Failing to advise Plaintiffs and Class members that the SCE Strategy did not comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(8)     Failing to advise Plaintiffs and Class members that the SCE Strategy did not meet the strict requirements for a qualified conservation easement under Section 170(h) of the Code;

(9)     Advising Plaintiffs and the Class members that the donations of the conservation easements met the requirements of Section 170(h) of the

Code and therefore provided lawful and legitimate tax benefits for the Plaintiffs and the Class;

(10)    Failing to advise Plaintiffs and the Class members that the donations of the conservation easements did not meet the requirements of Section 170(h) of the Code and therefore did not provide lawful and legitimate tax benefits for the Plaintiffs and the Class;

(11)    Advising Plaintiffs and Class members that they would receive substantial tax advantages in the form of charitable contribution deductions by engaging in the SCE Strategy;

(12)    Failing to advise Plaintiffs and Class members that the IRS had expressed its clear intent to disallow the tax benefits that were promised from the SCE Strategy;

(13)    Advising Plaintiffs and Class members that the SCE Strategy complied with Code § 170(h) and therefore the donations of conservation easements would provide legal and allowable tax deductions;

(14)    Failing to advise Plaintiffs and Class members that the IRS had expressed its clear intent to conclude that the SCE Strategy did not comply with Code § 170(h) and therefore the donations of conservation easements would not provide legal and allowable tax deductions;

(15)     Failing to advise Plaintiffs and Class members that the Appraisals were significantly inflated, thereby grossly inflating the Code § 170(h) deduction;

(16)     Advising Plaintiffs and Class members that the Appraisals complied with Code § 170, applicable tax laws and regulations, appraisal industry standards, regulations and rules;

(17)     Failing to advise Plaintiffs and Class members that the Appraisals did not comply with § 170, applicable tax laws and regulations, and appraisal industry standards, regulations and rules;

(18)     Advising Plaintiffs and the Class members to sign and file tax returns reporting the tax deductions and benefits of the SCE Strategy;

(19)     Failing to advise Plaintiffs and the Class members not to sign and file tax returns reporting the tax deductions and benefits of the SCE Strategy because the IRS had expressed its clear intent to disallow them as improper and illegal;

(20)     Advising, instructing, and assisting in the preparation of the tax returns for Plaintiffs and Class members that reported the donations of the conservation easements as charitable contribution deductions;

(21)     Failing to advise Plaintiffs and Class members not to report the donations of the conservation easements as charitable contribution deductions;

(22)     Advising Plaintiffs and Class members that their tax returns, which reported the charitable contribution deductions, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(23)     Failing to advise Plaintiffs and Class members that their tax returns, which reported the charitable contribution deductions, did not comply with IRS guidelines and established legal authorities;

(24)     Failing to disclose to Plaintiffs and Class members that if they filed tax returns that reported the charitable contribution deductions, the IRS would take the position that Plaintiffs and Class members would be liable for taxes, penalties and/or interest, if audited;

(25)     Failing to advise Plaintiffs and Class members that the tax benefits of the SCE Strategy would be disallowed, if audited;

(26)     Making and endorsing the statements and representations contained in the Defendants' and their co-conspirators' written advice, instructions, and recommendations; and

(27)     Failing to advise Plaintiffs and Class members that each of the Defendants and the Other Participants were not "independent" of one another

and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy, a strategy that largely depended upon the IRS not auditing a particular transaction for it to be successful.

277.   The predicate acts, including the predicate acts of wire and mail fraud, are continuing.  Defendants and their co-conspirators, on their own and as part of a common and mutual fraudulent scheme and conspiracy, defrauded Plaintiffs as set out above.

278.   Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain.  Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material.  Plaintiffs and the Class were injured as a result of Defendants' and their co-conspirators' misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on Defendants' (and their co-conspirators') improper advice and their fraudulent and false misrepresentations and omissions.

279.   Defendants and their co-conspirators made continual use of wire transmissions, in addition to communications made outside the interstate wire systems, to effectuate their fraudulent scheme.  In addition to using in person,

telephonic, and other means of communication to make fraudulent statements, Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Plaintiffs and the Class through the mail, by fax, and/or by email.

280.   Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the SCE Strategy and subsequently filing tax returns based on Defendants' (and their co-conspirators') fraudulent and false misrepresentations and omissions.

281.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire and mail fraud, committed by Defendants and their co-conspirators pursuant to their transactions to defraud Plaintiffs.

282.   Plaintiffs have therefore been injured in their business or property as a result of Defendants' and their co-conspirators' overt acts and racketeering activities.

## E.   Pattern of Racketeering Activity

283.   Plaintiffs repeat, reallege and incorporate paragraphs 248-282, as if fully set forth herein.

284.   As set forth above, Defendants and their co-conspirators have engaged in a "pattern of racketeering activity," as defined in § 1961(5) of RICO and O.C.G.A. § 16-14-3(4), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years (and within the past five years with respect to the Georgia RICO Statute).   Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs and the Class.

285.   The multiple acts of racketeering activity committed and/or conspired to by Defendants and their co-conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) and O.C.G.A. § 16-14-3(4).   Plaintiffs allege that the course of conduct engaged in by Defendants and their co-conspirators constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5) and O.C.G.A. § 16-14-3(4).   Plaintiffs can show the relatedness prong because the predicate acts

have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the transactions underlying the SCE Strategy so that Defendants and their co-conspirators could defraud Plaintiffs. Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended since for at least nine years (a substantial period of time).  Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicates are attributed to Defendants' and their co-conspirators' operations as part of a long-term association that existed for criminal purposes.   Further, the last act of racketeering activity that is alleged as the basis of Plaintiffs' claims occurred within four years of a prior act of racketeering.

286.   Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' and their co-conspirators' overt acts and racketeering activities as described above and throughout this Complaint.  More specifically, Defendants' misrepresentations and material omissions, expressed both directly and indirectly with Defendants' intent that the misrepresentations would be communicated to and acted upon by Plaintiffs and the Class, induced Plaintiffs and the Class both to enter in the transactions and professional relationships that make

up the SCE Strategy and to take positions with the IRS regarding the tax and financial implications of the SCE Strategy. But for Defendants' misrepresentations and omissions, Plaintiffs and the Class would not have entered into the SCE Strategy and/or would not have taken the positions that they did with the IRS regarding the tax and financial implications of the SCE Strategy. And, as a direct result of entering into the SCE Strategy and taking positions with the IRS that Defendants recommended and endorsed, Plaintiffs suffered injuries in that they paid fees and invested funds to participate in the SCE Strategy, bypassed the opportunity to participate in other tax-advantaged investments, paid professional fees in connection with proceedings before the IRS, and incurred back-taxes, penalties and interest imposed by the IRS.

## VIII.
## PLAINTIFFS' CLAIMS WERE TIMELY FILED OR, ALTERNATIVELY, THE DISCOVERY RULE AND EQUITABLE TOLLING DEFERRED ACCRUAL OF THE APPLICABLE STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

287.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

288.   The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

289.   In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed because the discovery rule, equitable tolling and/or the continuing tort doctrine deferred accrual of the respective statutes of limitation for such causes of action.

290.   While Defendants and their co-conspirators had actual knowledge of the injuries and wrongful conduct alleged herein, they concealed them by intentionally remaining silent and/or making misrepresentations despite having a duty to inform Plaintiffs of such injuries and wrongful acts and omissions. Defendants' and their co-conspirators' silence and misrepresentations prevented Plaintiffs from discovering their injuries and Defendants' wrongful acts and omissions.

291.   Defendants and their co-conspirators further advised Plaintiffs that they should be represented in the IRS and Tax Court proceedings by Bryan Cave, which had clear conflicts of interest as a promoter of the very SCE Strategy transactions at issue.  In providing this advice, Defendants and their co-conspirators made false representations and concealed material facts relating to Defendants' wrongdoing and the numerous flawed aspects of the SCE Strategy.   In reliance on these representations and this advice, Plaintiffs and the Class members were delayed and deterred from bringing their claims against Defendants earlier.  Defendants' and

their co-conspirators' concealment therefore prevented Plaintiffs and the Class members from discovery of the nature of their claims.

292.   Defendants and their co-conspirators had a fixed purpose to conceal the wrongful conduct and injuries. Plaintiffs and the Class members reasonably relied on the Defendants' and their co-conspirators' silence and misrepresentations to the detriment of Plaintiffs and the Class members.

293.   Plaintiffs and the Class members exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants rendering faulty advice and continued through Tax Court proceedings, which are ongoing.  However, Plaintiffs did not and could not discover the wrongful acts of Defendants or the injuries caused by the wrongful acts of Defendants alleged herein until shortly before the filing of this lawsuit.

## IX.
## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF RICO (18 U.S.C. § 1962(C))
### (By all Plaintiffs and the Class Against all Defendants)

294.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

295.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

296.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise, as set forth in paragraphs 250-259.

297.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity, as set forth in paragraphs 283-286.

298.   Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in paragraphs 260-263 and 283-286.

299.   Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Plaintiffs and Class members of money and property rights.  In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants devised a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise provided Defendants this access.

300.   With respect to the activities alleged herein, Defendants have acted at all times with malice toward Plaintiffs and Class members in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

301.   In carrying out the overt acts and fraudulent scheme described above, Defendants have engaged in conduct in violation of federal laws, including, *inter alia*, 18 U.S.C. §§ 1341, 1343 and 1346, and 18 U.S.C. §§ 1961, *et seq*., as set forth more fully above.

302.   Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under," *inter alia*, 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

303.   As a direct and proximate result of Defendants' and their co-conspirators' overt acts and racketeering activities as described above and throughout this Complaint, Plaintiffs and the Class have been injured in their business or property.   More specifically, Defendants' misrepresentations and material omissions, expressed both directly and indirectly with Defendants' intent that the misrepresentations would be communicated to and acted upon by Plaintiffs and the Class, induced Plaintiffs and the Class both to enter in the transactions and professional relationships that make up the SCE Strategy and to take positions with the IRS regarding the tax and financial implications of the SCE Strategy.   But for Defendants' misrepresentations and omissions, Plaintiffs and the Class would not have entered into the SCE Strategy and/or would not have taken the positions that they did with the IRS regarding the tax and financial implications of the SCE Strategy.   And, as a direct result of entering into the SCE Strategy and taking

positions with the IRS that Defendants recommended and endorsed, Plaintiffs suffered injuries in that they paid fees and invested funds to participate in the SCE Strategy, bypassed the opportunity to participate in other tax-advantaged investments, paid professional fees in connection with proceedings before the IRS, and incurred back-taxes, penalties and interest imposed by the IRS.

## COUNT II
## VIOLATIONS OF RICO (18 U.S.C. § 1962(D))
## (By Conspiring to Violate 18 U.S.C. § 1962(C))
## (By All Plaintiffs and the Class Against All Defendants)

304.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

305.   This claim for relief arises under 18 U.S.C. § 1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. § 1962(d) for their conspiracy to violate 18 U.S.C. § 1962(c).

306.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise, as set forth in paragraphs 250-259.

307.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity, as set forth in paragraphs 283-286.

308.   Absent Defendants' conspiracy and joint efforts with their co-conspirators, Defendants' scheme would not be successful. Acting jointly, Defendants and their co-conspirators have and have possessed greater power, have

been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

309.   Defendants have also violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).   The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the affairs of the § 1962(c) Enterprise described previously through a pattern of racketeering activity.

310.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. § 1962(c) in violation of § 1962(d) by various third parties not named as Defendants herein, such as the Other Participants.

311.   As demonstrated in detail above, Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud Plaintiffs and the Class of money and other property interests.

312.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

313.   Defendants and their co-conspirators have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

    a.    Multiple instances of mail fraud violations of 18 U.S.C. § 1341;

    b.    Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

    c.    Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

314.   As a direct and proximate result of Defendants' and their co-conspirators' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

**COUNT III**
**VIOLATIONS OF GEORGIA RICO (O.C.G.A. § 16-14-4(A) & (B))**
**(By All Plaintiffs and the Class Against All Defendants)**

315.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

316.   O.C.G.A. §§ 16-14-4(a) and (b)  provides that "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money" and "it shall be unlawful for any person employed by or associated with any

enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

317.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise, as set forth in paragraphs 250-259.

318.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity, as set forth in paragraphs 283-286.

319.   Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in paragraphs 260-263 and 283-286.

320.   Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights.  In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

321.   With respect to the activities alleged herein, Defendants have acted at all times with malice toward Plaintiffs and the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

322.   In carrying out the overt acts and fraudulent scheme described above, Defendants have engaged in conduct in violation of Georgia state law as set forth more fully above.

323.   Therefore, Defendants have each engaged in "racketeering activity" as set out in § 16-14-3(5)(C) of Georgia RICO.

324.   As a direct and proximate result of Defendants' and their co-conspirators' overt acts and racketeering activities as described above and throughout this Complaint, Plaintiffs and the Class have been injured in their business or property.   More specifically, Defendants' misrepresentations and material omissions, expressed both directly and indirectly with Defendants' intent that the misrepresentations would be communicated to and acted upon by Plaintiffs and the Class, induced Plaintiffs and the Class both to enter in the transactions and professional relationships that make up the SCE Strategy and to take positions with the IRS regarding the tax and financial implications of the SCE Strategy.   But for Defendants' misrepresentations and omissions, Plaintiffs and the Class would not have entered into the SCE Strategy and/or would not have taken the positions that they did with the IRS regarding the tax and financial implications of the SCE Strategy.   And, as a direct result of entering into the SCE Strategy and taking positions with the IRS that Defendants recommended and endorsed, Plaintiffs suffered injuries in that they paid fees and invested funds to participate in the SCE

Strategy, bypassed the opportunity to participate in other tax-advantaged investments, paid professional fees in connection with proceedings before the IRS, and incurred back-taxes, penalties and interest imposed by the IRS.

**COUNT IV**
**CONSPIRACY TO VIOLATE GEORGIA RICO (O.C.G.A. § 16-14-4(C))**
**(By All Plaintiffs and the Class Against All Defendants)**

325.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

326.   This claim for relief arises under and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate O.C.G.A. §§ 16-14-4(a) and (b).

327.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise, as set forth in paragraphs 250-259.

328.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity, as set forth in paragraphs 283-286.

329.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful.  Acting jointly with their co-conspirators, Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

330.   The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise(s) described previously through racketeering activity.

331.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate O.C.G.A. §§ 16-14-4(a) and (b) by various third parties not named as Defendants herein, such as the Other Participants.

332.   As demonstrated in detail above, Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud Plaintiffs and the Class of money and other property interests.

333.   The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of conspiring to violate, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

334.   Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud.

335.   As a direct and proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

## COUNT V
## FRAUD
## (By All Plaintiffs and the Class Against All Defendants)

336.   Plaintiffs and Class members repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

337.   In order to induce Plaintiffs and the Class to participate in the SCE Strategy and pay substantial fees and other monies to Defendants and the Other Participants, Defendants directly and indirectly through the Other Participants made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs and the Class, including but not limited to:

(1)      Misstating, in light of published authorities, the tax treatment Plaintiffs and Class members would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCE Strategy;

(2)      Advising Plaintiffs and Class members that the donation of the conservation easement is fully tax deductible as a qualified charitable contribution deduction;

(3)　　　　Advising Plaintiffs and Class members that the Syndicate contributed a qualified real property interest as required to be a valid "qualified conservation contribution";

(4)　　　　Failing to advise Plaintiffs and Class members that the value of the conservation easement and associated tax benefits in the SCE Strategy constitute a gross valuation overstatement, thus subjecting Plaintiffs to penalties;

(5)　　　　Advising Plaintiffs and Class members that the appraisal commissioned by Defendants relied on and utilized appropriate assumptions, data, and methodology;

(6)　　　　Failing to advise Plaintiffs and Class members that the appraisal commissioned by Defendants relied on and utilized inappropriate assumptions, data, and methodology;

(7)　　　　Advising Plaintiffs and Class members that the appraisal commissioned by Defendants complied with Code § 170, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(8)　　　　Failing to advise Plaintiffs and Class members that the appraisal commissioned by the Defendants did not comply with Code § 170, applicable

regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(9)     Advising Plaintiffs and Class members that the appraisal commissioned by Defendants provided accurate valuation statements, including the fair market value of the conservation easement;

(10)     Providing false valuation statements to Plaintiffs and Class members, including the fair market value of the conservation easement;

(11)     Failing to advise Plaintiffs and Class members that the Syndicate did not donate a "qualified real property interest" because the property that was the subject of the conservation easement could be modified;

(12)     Failing to advise Plaintiffs and Class members that the Syndicates retained or reserved rights to the property that were inconsistent with the conservation purposes of the conservation easement;

(13)     Failing to advise Plaintiffs and Class members that the Syndicates did not properly document the condition of the property at the time of the donation;

(14)     Failing to advise Plaintiffs and Class members that the Appraiser Defendants were not "qualified appraisers" and did not prepare "qualified appraisals" as required by the Code and Regulations thereunder;

(15)    Advising Plaintiffs and Class members that the Syndicates donated a "qualified real property interest";

(16)    Advising Plaintiffs and Class members that the Syndicates properly documented the condition of the property at the time of the donation;

(17)    Advising Plaintiffs and Class members that the Tennille Defendants were "qualified appraisers" and prepared "qualified appraisals" as required by the Code and Regulations thereunder;

(18)    Failing to advise Plaintiffs and Class members that the Tennille Defendants relied upon inappropriate assumptions, utilized inappropriate methodology, and used various techniques to improperly inflate the value of the conservation easements;

(19)    Failing to advise Plaintiffs and Class members that the Tennille Defendants incorrectly reached unsupportable and/or predetermined HBU conclusions;

(20)    Failing to advise Plaintiffs and Class members that the Tennille Defendants arrived at the unsupportable HBU by ignoring local zoning rules and other legal restrictions on purported developments, physical and financial feasibility, market conditions, and market data;

(21)     Failing to advise Plaintiffs and Class members that the Tennille Defendants ignored the sale of conservation easements in the area of the property in determining the value of the conservation easement;

(22)     Failing to advise Plaintiffs and Class members that the Tennille Defendants ignored the proceeds received by the Syndicate by its sale of membership interests to investors in determining the fair market value of the conservation easement contribution;

(23)     Failing to advise Plaintiffs and Class members that the Tennille Defendants failed to employ recent, local or similar sales that competed with the subject property or would have been considered "substitutes" for the subject property by potential buyers when employing the "comparable sales method";

(24)     Advising Plaintiffs and Class members that the appraisals conformed with USPAP;

(25)     Failing to advise Plaintiffs and Class members that the appraisals did not follow the USPAP because of, among other things, the appraisal's flawed methodology, inappropriate data and unsupportable assumptions;

(26)     Advising Plaintiffs and Class members that the appraisals complied with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(27)     Failing to advise Plaintiffs and Class members that the appraisals failed to comply with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(28)     Advising Plaintiffs and Class members that the charitable deduction was based on the fair market value of the conservation easement;

(29)     Failing to advise Plaintiffs and Class members that the charitable deduction was not based on the fair market value of the conservation easement;

(30)     Advising Plaintiffs and Class members that the property has specific conservation values that satisfy the Code;

(31)     Failing to advise Plaintiffs and Class members that the property did not have specific conservation values that satisfy the Code;

(32)     Advising Plaintiffs and Class members that the HBU for the property before granting the conservation easement was a residential development;

(33)     Failing to advise Plaintiffs and Class members that the HBU for the property before granting the conservation easement was not a residential development but was in fact recreational use or timber harvesting only;

(34)      Advising Plaintiffs and Class members that the conservation easement restrictions complied with the Code requirement that it must be perpetual;

(35)      Failing to advise Plaintiffs and Class members that the conservation easement restrictions did not comply with the Code requirement that it must be perpetual;

(36)      Advising Plaintiffs and Class members that the conservation easement met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in Code § 170;

(37)      Failing to advise Plaintiffs and Class members that the conservation easement did not accomplish any of the permissible conservation purposes set out in Code § 170 and, as a result, did not meet the requirement that the conservation easement be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in § 170;

(38)      Failing to advise Plaintiffs and Class members that in determining the HBU of the property as a residential development, the Tennille Defendants allowed the other Defendant to control the appraisal's conclusions and the fair market value of the conservation easement;

(39)     Advising Plaintiffs and Class members that the appraisals met Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(40)     Failing to advise Plaintiffs and Class members that the appraisals did not meet Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(41)     Advising Plaintiffs and Class members that the HBU of the Property was determined based on the standards for the valuation of a conservation easement for the purposes of claiming a non-cash charitable contribution of a partial interest, when in fact it did not;

(42)     Advising Plaintiffs and Class members that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of conservation easements, when in fact it did not because it (a) used an incorrect and unsupportable HBU conclusion; (b) failed to employ recent, local and similar sales; (c) lacked objectivity and appropriate analysis of after easement sales; (d) lacked consideration of easement sales; and (e) advocated a loss in value due to lost development rights when the market data indicates there is no market for the residential development;

(43)    Failing to advise Plaintiffs and Class members that the "before value" is hypothetical and unreasonable and is not an estimate of the fair market value of the land at its HBU as of the date of the valuation before the easement conveyance;

(44)    Advising Plaintiffs and Class members that the appraisal was done by a qualified appraiser when in fact it was not due to the abundant acceptance of direction by the appraiser from the Syndicate which resulted in an inflated fair market value of the conservation easement;

(45)    Advising Plaintiffs and Class members that the value of the conservation easement and thus the value of the charitable contribution deduction that should be used on the income tax return was proper;

(46)    Failing to advise Plaintiffs and Class members that the value of the conservation easement and thus the value of the charitable contribution deduction to be used on the income tax return was improper;

(47)    Failing to advise Plaintiffs and Class members that the HBU valuation as a residential development was not financially feasible and, therefore, improper;

(48)    Failing to advise Plaintiffs and Class members that the appraisal did not comply with Notice 2006-96, which provides guidance related to the definition of "qualified appraisal" and "qualified appraiser";

(49)     Failing to advise Plaintiffs and Class members that the appraisal is not a qualified appraisal under Code § 170 because the HBU was improperly determined and lacked supporting data or any analysis of financial feasibility;

(50)     Failing to advise Plaintiffs and Class members that the appraisal was not a "qualified appraisal" under Code § 170 because the appraiser did not address nor analyze the likelihood that the property could be utilized according to the appraiser's HBU;

(51)     Advising Plaintiffs and Class members that the Conservation Easement Deed substantiated a valid conservation purpose;

(52)     Failing to advise Plaintiffs and Class members that the Conservation Easement Deed did not substantiate a valid conservation purpose;

(53)     Advising Plaintiffs and Class members that the Baseline Documentation Report supported a valid conservation purpose on the property;

(54)     Failing to advise Plaintiffs and Class members that the Baseline Documentation Report did not support a valid conservation purpose on the property;

(55)     Advising Plaintiffs and Class members that the Conservation Easement Deed protected the land in perpetuity and therefore qualified for a federal charitable deduction;

(56)     Failing to advise Plaintiffs and Class members that the Conservation Easement Deed did not protect the land in perpetuity and therefore did not qualify for a federal charitable deduction;

(57)     Advising Plaintiffs and Class members that the Conservation Easement Deed permits activity that is consistent with a valid conservation purpose;

(58)     Failing to advise Plaintiffs and Class members that the Conservation Easement Deed permits activity that is inconsistent with a valid conservation purpose and therefore did not qualify for a federal charitable deduction;

(59)     Failing to advise Plaintiffs and Class members that the Appraisal Summary (Form 8283) was not properly prepared and submitted;

(60)     Failing to advise Plaintiffs and Class members that the failure to provide the cost basis or inaccurate cost basis of the property on the Appraisal Summary (Form 8283) would result in complete disallowance of the charitable deduction;

(61)     Advising Plaintiffs and Class members that the substantiation requirements were met and therefore the charitable contribution deduction would be allowed;

(62)     Failing to advise Plaintiffs and Class members that the substantiation requirements were not met and, therefore, the charitable contribution deduction would be disallowed;

(63)     Advising Plaintiffs and Class members that the Appraisal Summary (Form 8283) was prepared properly and included all information required for the charitable contribution deduction to be allowed;

(64)     Advising Plaintiffs and Class members to report the charitable contribution deduction on their individual tax returns;

(65)     Advising Plaintiffs and Class members that the K-1 reporting the charitable contribution deduction allocated to each Plaintiffs was proper and accurate and should be used to report the deduction on their individual return;

(66)     Failing to advise Plaintiffs and Class members that the K-1 reporting the charitable contribution deduction allocated to each Plaintiffs was not accurate and should not be relied upon in reporting the charitable contribution deduction on their individual tax return;

(67)     Preparing and signing the Syndicate's tax return and Plaintiffs and Class members' K-1s reporting the charitable contribution deduction

based on the fair market value of the conservation easement determination in the appraisal;

(68)     Advising Plaintiffs and Class members that the tax benefits of the SCE Strategy would be allowed if audited;

(69)     Failing to advise Plaintiffs and Class members that the tax benefits of the SCE Strategy would be disallowed if audited;

(70)     Failing to advise Plaintiffs and Class members before, during and after the IRS audit that the SCE Strategy they executed was not different or distinguishable from other SCE Strategy transactions that the IRS and/or Tax Court had disallowed;

(71)     Failing to advise Plaintiffs and Class members that they should not challenge the IRS in audits and/or Tax Court proceedings because Plaintiffs and Class members would not prevail and the SCE Strategy would be disallowed;

(72)     Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' written advice, instructions, and recommendations; and

(73)     Failing to advise Plaintiffs and Class members that each of the Defendants and the Other Participants were not "independent" of one another

and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy.

338.   The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and Defendants knew these representations to be false when made with the intention that Plaintiffs and the Class would rely upon them to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and paid substantial fees to Defendants and the Other Participants. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by Defendants with the intent to induce Plaintiffs and the Class to enter into the SCE Strategy, pay substantial sums to participate in the SCE Strategy, and pay substantial fees to Defendants and the Other Participants.  To the extent any Defendant did not directly make any of the misrepresentations identified above, they were knowing participants in the fraud alleged herein.

339.  In reasonable reliance on Defendants' false affirmative misrepresentations and intentional omissions of material fact regarding the SCE Strategy, Plaintiffs and the Class engaged in the SCE Strategy; paid substantial sums to participate in the SCE Strategy; paid substantial fees to Defendants and the Other Participants; did not avail themselves of other legitimate tax savings opportunities; filed federal and state tax returns that reflected charitable contribution deductions;

and spent substantial funds in connection with IRS audits and Tax Court proceedings.

340. But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and the Class would not have hired Defendants and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to Defendants and the Other Participants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, failed to file a qualified amended return, and spent substantial funds in connection with IRS audits and Tax Court challenges.

341. As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to Defendants and the Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (5) spent substantial funds in connection with the IRS audits and in Tax Court proceedings, and (6) have and will continue to incur substantial additional costs to rectify the situation.

342.   As a proximate cause of the foregoing injuries, Plaintiffs and the Class have been injured in an actual amount to be proven at trial but in excess of $5,000,000 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VI
## BREACH OF FIDUCIARY DUTY AND DISGORGEMENT
### (By All Plaintiffs and the Class Against the Peachtree Defendants, the Old Ivy Defendants, the Tennille Defendants, Bryan Cave and Warren Averett)

343.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

344.   As professional advisors who provided services and advice to Plaintiffs and the Class members in connection with the SCE Strategy, the Professional Defendants became fiduciaries of Plaintiffs and the Class.  Plaintiffs and the Class placed their trust and confidence in the Professional Defendants due to their express level of expertise in the highly technical subject matters at issue, and the Professional Defendants thus had influence and superiority over Plaintiffs and the Class.  Thus, the Professional Defendants owed Plaintiffs and the Class duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.  The Professional Defendants breached these duties and caused Plaintiffs and Class members harm and injury, including but not limited to, their failures to disclose their conflicts of interest.

345.   The Professional Defendants' breaches were a proximate cause of damages to Plaintiffs and Class members.   In reasonable reliance on these Defendants' advice regarding the SCE Strategy, Plaintiffs and the Class: (1) paid fees and other monies to the Defendants and the Other Participants for tax and appraisal advice; (2) did not avail themselves of legitimate tax savings opportunities; (3) filed federal and state tax returns that reflected deductions for the donations of conservation easements in connection with the SCE Strategy; and (4) spent substantial funds defending the IRS audits and in the Tax Court proceedings.   But for Defendants' breaches, Plaintiffs and the Class would not have hired Defendants and the Other Participants for advice on the SCE Strategy, engaged in the SCE Strategy, paid substantial fees and other monies in connection with the SCE Strategy, filed and signed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, and/or spent substantial funds disputing the IRS audits and Tax Court challenges.

346.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial but in excess of $5,000,000 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

347.   As a result of the Professional Defendants' breaches of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any Class member, any other Defendant, and/or any Other Participant for work performed in connection with the SCE Strategy.

348.   Accordingly, the Professional Defendants must disgorge all such payments in favor of Plaintiffs and the Class in an amount in excess of $5 million. In addition, Plaintiffs and the Class seek an award of attorneys' fees, interest, and costs.

## COUNT VII
## AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
### (By All Plaintiffs and the Class Against All Defendants)

349.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

350.   As described throughout this Complaint, each of the Defendants aided and abetted the breaches of fiduciary duty of each of the Professional Defendants. Each Defendant was aware of and agreed to its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the Professional Defendants' tortious activity.

351.   Each of the Defendants acted to procure the breach of the Professional Defendants' fiduciary duties through improper conduct and without privilege.  Each

of the Defendants did this with knowledge that the primary wrongdoer owed Plaintiffs a fiduciary duty.  Each of the Defendants also acted purposely, with malice and the intent to injure.  Each of the Defendants' wrongful conduct procured the breach of the primary wrongdoer's fiduciary duty and each of the Defendants' tortious conduct proximately caused damage to Plaintiffs and the Class.

352.  As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and the Class have suffered injury and damages in that they (1) paid substantial sums to the Syndicates, (2) paid significant fees to Defendants and the Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (5) spent substantial funds in connection with the audits and in Tax Court proceedings, and (6) have and will continue to incur substantial additional costs to rectify the situation.  Plaintiffs and Class members have been injured in an actual amount to be proven at trial, but in excess of $5,000,000, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

353.  Furthermore, as a result of these Defendants' aiding and abetting the breach of fiduciary duties by others, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any

other Defendants, and/or any Other Participant for work performed in connection with the SCE Strategy.

## COUNT VIII
## PROFESSIONAL MALPRACTICE
### (By All Plaintiffs and the Class Against the Peachtree Defendants, the Old Ivy Defendants, the Tennille Defendants, Bryan Cave and Warren Averett)

354.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

355.   As professional advisors who provided services and advice to Plaintiffs and the Class members in connection with the SCE Strategy, the Peachtree Defendants, the Old Ivy Defendants, the Tennille Defendants, Bryan Cave and Warren Averett (collectively, the "Professional Defendants") owed Plaintiffs and the Class members a duty to comply with their respective applicable standards of care and the applicable provisions of their respective codes of professional responsibility.

356.   Regardless of privity, Plaintiffs and Class members are foreseeably persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Professional Defendants.

357.   The Professional Defendants failed to meet those applicable standards of care and their failure to do so proximately caused damages to Plaintiffs as set forth in this Complaint.

358.   The Professional Defendants' failures to meet the applicable standards of care constitute, at minimum, negligence.

359.   The Professional Defendants' actions rise to the level of gross negligence.  Accordingly, Plaintiffs and Class members seek punitive/exemplary damages against the Professional Defendants, jointly and severally.

360.   The Professional Defendants' negligence or gross negligence was a proximate cause of the damages for Plaintiffs and Class members.  In reasonable reliance on the Professional Defendants' professional advice regarding the SCE Strategy, Plaintiffs and Class members: (1) paid substantial sums of money to participate in the SCE Strategy; (2) paid fees to Defendants and Other Participants for professional advice and services; (3) did not avail themselves of legitimate tax savings opportunities; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; and (5) failed to file a qualified amended return.

361.   But for the Professional Defendants' negligence or gross negligence, Plaintiffs and Class members would not have agreed to engage in the SCE Strategy, hired Defendants and the Other Participants for advice and services in connection with the SCE Strategy, paid substantial fees in connection with the SCE Strategy, filed and signed federal and state tax returns that reported charitable contribution deductions from the SCE Strategy, failed to avail themselves of other legitimate tax

savings opportunities, failed to file qualified amended returns, and spent substantial funds in connection with IRS audits and Tax Court proceedings.

362.   As a result of the Professional Defendants' negligent and grossly negligent acts and omissions, Plaintiffs and Class members incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

363.   The Professional Defendants' negligence or gross negligence proximately caused damages to Plaintiffs and Class members in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) spent substantial funds in connection with the audits and Tax Court proceedings, (5) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, and (6) have and will continue to incur substantial additional costs to rectify the situation.

364.   As a proximate cause of the foregoing, Plaintiffs and Class members have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT IX**
**NEGLIGENCE**
**(By All Plaintiffs and the Class Against the Foothills Defendants)**

365.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

366.   As advisors who provided services and advice to Plaintiffs and Class members in connection with the SCE Strategy, the Foothills Defendants owed Plaintiffs and the Class members a duty to comply with the applicable standards of care.

367.   Regardless of privity, Plaintiffs and Class members are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by the Foothills Defendants.

368.   The Foothills Defendants failed to meet their applicable standards of care and their failure to do so proximately caused damages to the Plaintiffs as set forth in this Complaint.

369.   The Foothills Defendants' failures to meet the applicable standards of care constitute, at minimum, negligence.

370.   The Foothills Defendants' actions rise to the level of gross negligence. Accordingly, Plaintiffs and Class members seek punitive/exemplary damages against the Foothills Defendants, jointly and severally.

371.   The Foothills Defendants' negligence or gross negligence proximately caused damages to Plaintiffs and Class members in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the tax savings that could have been provided had the SCE Strategy been properly structured and implemented in compliance with Section 170(h) of the Code; and (5) have incurred and will continue to incur substantial additional costs to rectify the situation.

372.   As a proximate cause of the foregoing, Plaintiffs and Class members have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT X
## NEGLIGENT MISREPRESENTATION
### (By All Plaintiffs and the Class Against
### All Defendants, In the Alternative to the Fraud Claim)

373.   Plaintiffs and Class members repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

374.   During the course of their representation of Plaintiffs and Class members, Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed in Count V above, that were incorrect, improper, or false; negligently made misleading omissions of material

fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and Class members. In addition, each Defendant is liable for each negligent misrepresentation and omission made by each of their co-conspirators.

375. Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong. Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs and Class members were improper and wrong and would mislead Plaintiffs and Class members.

376. As professionals and advisors who provided services and advice to Plaintiffs and Class members in connection with the SCE Strategy, Defendants owed Plaintiffs and Class members a duty to correctly state all facts regarding the SCE Strategy. Regardless of privity, Plaintiffs and Class members are foreseeable persons or among the limited class of persons for whom the information was intended, either directly or indirectly, and thus a duty was owed by each of the Defendants.

377. Plaintiffs and the Class reasonably relied upon the Defendants' representations and advice.

378. Defendants' and their co-conspirators' negligent and grossly negligent misrepresentations were a proximate cause of the damages of Plaintiffs and Class

members.  In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiffs and Class members: (1) paid substantial sums to participate in the SCE Strategy; (2)  paid substantial fees to Defendants and the Other Participants for professional advice and services; (3) did not avail themselves of legitimate tax savings opportunities; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) did not file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

379.   But for Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations and material omissions described above, Plaintiffs and Class members would not have hired Defendants and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial funds to participate in the SCE Strategy, paid substantial fees to Defendants and the Other Participants for professional advice and services, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, and spent substantial funds in connection with IRS audits and Tax Court challenges.

380.   Defendants' conduct set forth herein proximately and directly caused Plaintiffs and Class members to suffer injury in that each of them (1) paid substantial

sums to participate in the SCE Strategy, (2) paid significant fees to Defendants and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (5) spent substantial funds in connection with the audits and Tax Court proceedings, and (6) have and will continue to incur substantial additional costs to rectify the situation.

381.   As a proximate cause of the foregoing, Plaintiffs and the Class have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

**COUNT XI**
**RESCISSION**
**(<u>In the Alternative, By All Plaintiffs and the Class Against All Defendants</u>)**

382.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

383.   In connection with the SCE Strategy transactions, Plaintiffs, members of the Class, and the Syndicates were provided by Defendants with documents purporting to disclaim or limit the rights of Plaintiffs and the Class (collectively, "Purported Disclaimers"). In deciding to engage in the SCE Strategy transactions, Plaintiffs and the Class relied on numerous, material, knowingly false, affirmative representations and intentional omissions of material fact that Defendants made

directly or indirectly to Plaintiffs and the Class, as set forth above.  Had Defendants not made those misrepresentations or omissions, Plaintiffs and the Class would not have engaged in the SCE Strategy transactions.   Defendants made those misrepresentations and omissions with the intent that Plaintiffs and the Class would rely on them.  Furthermore, the concealment is of intrinsic qualifies of the features of the SCE Strategy (such as, highly technical issues about the adequacy and legitimacy of appraisals and other transaction documents and whether the SCE Strategy satisfied Code § 170 and the regulations promulgated thereunder) which Plaintiffs by the exercise of ordinary prudence and caution could not discover and, because they related to federal tax consequences, under well-established law had no duty to seek to discover.  Alternatively, Defendants had a duty to disclose these matters.

384.   Thus, Defendants fraudulently induced Plaintiffs and the Class to enter into the SCE Strategy transactions in furtherance of the conspiracy among Defendants and the Other Participants.

385.   Plaintiffs and the Class seek rescission of all agreements and all documents they received in connection with entering into the SCE Strategy transactions, including the Purported Disclaimers.  In addition, Plaintiffs and the Class seek an award of attorneys' fees, interest, and costs.  Collectively, there is more than $5 million at issue.

386.   Plaintiffs had no duty to rescind before filing, not to restore any consideration because it would unreasonable to require them to do so, if not impossible, given disposition of all of the assets of the PropCos/LLCs and the years of tax returns already filed and under audit.

**COUNT XII**
**CIVIL CONSPIRACY**
**(By All Plaintiffs and the Class Against All Defendants)**

387.   Plaintiffs repeat, reallege and incorporate paragraphs 1-12 and 33-286 as if fully set forth herein.

388.   As described more fully above, Defendants and the Other Participants knowingly acted in concert and had a common and mutual design to design, promote, sell, and implement the SCE Strategy.  In furtherance of their conspiracy, Defendants and the Other Participants conspired to perpetrate a fraud on Plaintiffs and the Class and to breach fiduciary duties or aid and abet the breach of fiduciary duties owed to Plaintiffs and the Class.  In doing so, Defendants and the Other Participants acted with full knowledge and awareness that the SCE Strategy was designed to give the false impression that a complex series of transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary to create a legitimate conservation easement charitable contribution deduction.

389.   Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs and to breach or aid the breach of fiduciary duties owed to Plaintiffs, all for the purpose of convincing Plaintiffs and the Class to participate in the SCE Strategy and enrich Defendants. Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and Other Participant made to Plaintiffs and Class members.

390.   The acts of Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and the Class and a conspiracy to breach, or aid the breach of fiduciary duties owed to Plaintiffs and the Class.

391.   There was a meeting of the minds between and among Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud and breach or aid the breach of fiduciary duties owed to Plaintiffs and the Class.  The conspiracy to commit these unlawful and fraudulent acts directly and proximately caused and continues to cause damages to Plaintiffs and the Class as previously set forth herein.

392.   As a direct and proximate result of Defendants' conduct set forth herein, Plaintiffs and the Class have suffered injury in that they (1) paid substantial

sums to participate in the SCE Strategy; (2) paid significant fees to Defendants and the Other Participants; (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties; (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities; (5) spent substantial funds in connection with the IRS audits and Tax Court proceedings; and (6) have and will continue to incur substantial additional costs to rectify the situation.

393.   Plaintiffs and Class members have been injured in an actual amount to be proven at trial but in excess of $5 million and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## X.
## PRAYER FOR RELIEF

394.   Based upon the foregoing, Plaintiffs request that Defendants be cited to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Plaintiffs and the Class have judgment against Defendants, jointly and severally for:

a.   actual, consequential, and incidental damages;

b.   rescission and disgorgement as sought herein;

c.   pre- and post-judgment interest at the highest legal rate allowed by law;

d.   all attorneys' fees and costs in pursuing this matter;

e.      punitive and treble damages in an amount to be determined at

trial; and

f.      such other and further relief, both at law and in equity, to which

Plaintiffs and the Class may show themselves to be justly entitled.

Dated:  July 21, 2021

Respectfully submitted,

/s/ *Jeven R. Sloan*

David R. Deary (admitted *pro hac vice*)
W. Ralph Canada, Jr. (admitted *pro hac vice*)
Jeven R. Sloan (GA Bar No. 652727)
Donna Lee (admitted *pro hac vice*)
Wilson E. Wray, Jr. (admitted *pro hac vice*)
Tyler M. Simpson (admitted *pro hac vice*)
John McKenzie (admitted *pro hac vice*)
**LOEWINSOHN DEARY SIMON RAY LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile
davidd@ldsrlaw.com
ralphc@ldsrlaw.com
jevens@ldsrlaw.com
donnal@ldsrlaw.com
wilsonw@ldsrlaw.com
tylers@ldsrlaw.com
johnm@ldsrlaw.com


Edward J. Rappaport (GA Bar No. 594841)
**THE SAYLOR LAW FIRM LLP**
1201 W. Peachtree Street
Suite 3220
Atlanta, GA 30309
(404) 892-4400 Telephone
erappaport@saylorlaw.com


*Attorneys for Plaintiffs*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Under Local Rule 7.1(D), I certify that this document complies with the font and point selections set forth in Local Rule 5.1.  This document was prepared in Times New Roman 14-point font.


*/s/ Jeven R. Sloan*